### In re J. P. LINAHAN, Inc.
### Nos. 142, 143.

Circuit Court of Appeals, Second Circuit.
Nov. 8, 1943.

See, also, 133 F.2d 688.

Weinstein & Levinson, of New York City, for answering stockholders and answering creditor.

Baar, Bennett & Fullen, of New York City (Frank Weinstein, Samuel J. Levinson, and John P. Hurley, all of New York City, of counsel), for debtor.

Raymond J. Scully, of New York City, for petitioning creditors.

Edward Robinson, Jr., of Oyster Bay, L. I., N. Y., for debtor in possession.

Trachman & Krosner, of New York City (Raymond J. Scully, of New York City, Harry Robinson, of Oyster Bay, L. I., N. Y., and Hilbert I. Trachman and Irving R. Krosner, both of New York City, of counsel), for minority stockholder.

Before L. HAND, SWAN, and FRANK, Circuit Judges.

FRANK, Circuit Judge.

■ 1. Appellants complain that the District Court, having appointed Referee Ol-ney as Special Master in Chapter X proceedings begun by involuntary petition and contested by appellants, denied appellants' application to remove that Special Master because of bias. Appellants point to matters alleged to show such bias, most of which are so frivolous as to deserve no discussion. Special emphasis is put on these facts: The Master has heretofore entered orders, accompanied by findings, adverse to appellants; the District Court's orders, approving these orders of the Master, were, in some instances, reversed by this court on previous appeals;[1] some of the findings of the Special Master are alleged to have been, at least by inference, disapproved on these appeals and, in one instance, to have been based on hearsay. These facts do not call for removal of the Special Master.[2] Appellants entertain a fundamentally false notion conception of the prejudice which disqualifies a judicial officer.[3]

Democracy must, indeed, fail unless our courts try cases fairly, and there can be no fair trial before a judge lacking in impartiality and disinterestedness. If, however, "bias" and "partiality" be defined to mean the total absence of preconceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will. The human mind, even at infancy, is no blank piece of paper. We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are pre-judices. Without acquired "slants," pre-conceptions, life could not go on. Every habit constitutes a pre-judgment; were those pre-judgments which we call habits absent in any person, were he obliged to treat every event as an unprecedented crisis presenting a wholly new problem he would go mad. Interests, points of view, preferences, are the

---

[1] See In re J. P. Linahan, Inc., 2 Cir., 111 F.2d 590; Moore v. Linahan, 2 Cir., 117 F.2d 140; In re J. P. Linahan, Inc., 2 Cir., 133 F.2d 688.

[2] The Special Master suggested that there was a disposition on appellants' part to prevent dispatch in the conduct of these proceedings. We do not regard that suggestion as proof of bias since we believe that there was considerable basis for such an inference on the Master's part. See In re J. P. Linahan, Inc., supra, which shows that, in 1940, we thought that appellants intended to apply to the district court to have the case transferred from Chapter X to Chapter XI, 11 U.S.C.A. §§ 501 et seq., 701 et seq., proceedings. Appellants had ample time thereafter in which to make such an application but have not done so; this fact was one of the important factors which led the Master to make the suggestion now said to manifest bias.

[3] We need not consider whether 28 U.S.C.A. § 25 is here applicable by analogy.

essence of living. Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference. "To live is to have a vocation, and to have a vocation is to have an ethics or scheme of values, and to have a scheme of values is to have a point of view, and to have a point of view is to have a prejudice or bias * * * "[4] An "open mind," in the sense of a mind containing no preconceptions whatever, would be a mind incapable of learning anything, would be that of an utterly emotionless human being, corresponding roughly to the psychiatrist's descriptions of the feeble-minded.[5] More directly to the point, every human society has a multitude of established attitudes, unquestioned postulates. Cosmically, they may seem parochial prejudices, but many of them represent the community's most cherished values and ideals.[6] Such social pre-conceptions, the "value judgments" which members of any given society take for granted and use as the unspoken axioms of thinking, find their way into that society's legal system, become what has been termed "the valuation system of the law."[7] The judge in our society owes a duty to act in accordance with those basic predilections inhering in our legal system (although, of course, he has the right, at times, to urge that some of them be modified or abandoned). The standard of dispassionateness obviously does not require the judge to rid himself of the unconscious influence of such social attitudes.[8]

In addition to those acquired social value judgments, every judge, however, unavoidably has many idiosyncratic "learnings of the mind," uniquely personal prejudices, which may interfere with his fairness at a trial. He may be stimulated by unconscious sympathies for, or antipathies to, some of the witnesses, lawyers or parties in a case before him. As Josiah Royce observed, "Oddities of feature or of complexion, slight physical variations from the customary, a strange dress, a scar, a too-steady look, a limp, a loud or deep voice, any of these peculiarities * * * may be, to one, an object of fascinated curiosity; to another * * *, an intense irritation, an object of violent antipathy."[9] In Ex parte Chase, 43 Ala. 303, Judge Peters said he had "known a popular judicial officer grow quite angry with a suitor in his court, and threaten him with imprisonment, for no ostensible reason, save the fact, that he wore an overcoat made of wolf skins," and spoke of "prejudice, which may be swayed and controlled by the merest trifles—such as the toothache, the rheumatism, the gout, or a fit of indigestion, or even through the very means by which indigestion is frequently sought to be avoided." "Trifles," he added, "however ridiculous, cease to be trifles when they may interfere with a safe administration of the law." Frankly to recognize the existence of such prejudices is the part of wisdom. The conscientious judge will, as far as possible, make himself aware of his biases of this character, and, by that very self-knowledge, nullify their effect.[10] Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases

---

[4] Kenneth Burke, Permanence and Change (1936) 329.

[5] Cf. Allen Johnson, The Historian and Historical Evidence (1926) 159-160; Sidgwick, The Application of Logic (1910) 229.

[6] To those devoted to "natural law" philosophy, the basic "preconceptions" in any particular legal system, to the extent that they are valid, represent specific local applications of universal principles. "Natural law" philosophy, however, recognizes not only that those universal principles are few and highly general but that their applications vary with time, place and circumstance. See authorities cited in Beidler & Bookmyer v. Universal Ins. Co., 2 Cir., 134 F.2d 828, 830, note 7.

[7] Cf. Wurzel, Methods of Juridical Thinking (1904) in The Science of Legal Method (1917) 286.

[8] A word of caution is needed here.

These social value judgments are often said to be a product of the "spirit of the times." One may doubt, however, whether, in any period, there is a single time spirit or, to use a common phrase, a single "climate of opinion." See Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 217, note 25; cf. Witmark & Sons v. Fred Fisher Music Co., 2 Cir., 125 F.2d 949, 964. The "time spirit" is often differently interpreted by different judges: "In every court there are likely to be as many estimates of the 'Zeitgeist' as there are judges on its bench." Cardozo, The Nature of The Judicial Process, 174.

[9] Royce, Race Questions, Provincialism and Other American Problems (1908) 47-52.

[10] One of the subtlest tendencies which a conscientious judge must learn to overcome is that of "leaning over backwards" in favor of persons against whom his prejudices incline him. Pascal wrote of

to be human and strips himself of all predilections, becomes a passionless thinking machine.[11] The concealment of the human element in the judicial process allows that element to operate in an exaggerated manner; the sunlight of awareness has an antiseptic effect on prejudices.[12] Freely avowing that he is a human being, the judge can and should, through self-scrutiny, prevent the operation of this class of biases.[13] This self-knowledge is needed in a judge because he is peculiarly exposed to emotional influences;[14] the "court room is a place of surging emotions * * *; the parties are keyed up to the contest, often in open defiance; and the topics at issue are often calculated to stir up the sympathy, prejudice, or ridicule of the tribunal."[15] The judge's decision turns, often, on what he believes to be the facts of the case. As a fact-finder, he is himself a witness—a witness of the witnesses; he should, therefore, learn to avoid the errors which, because of prejudice, often affect those witnesses.[16]

But, just because his fact-finding is based on his estimates of the witnesses, of their reliability as reporters of what they saw

---

some men who have been unjust in their efforts to exclude bias: "The sure way of losing a just cause is to get it recommended to these men by their near relatives." Pascal, Pensees, No. 82.

[11] "The judicial mind is subject to the laws of psychology like any other mind. When the judge assumes the ermine he does not divest himself of humanity. He has sworn to do justice to all men without fear or favour, but the impartiality which is the noble hallmark of our Bench does not imply that the judge's mind has become a mere machine to turn out decrees; the judge's mind remains a human instrument working as do other minds, though no doubt on specialized lines and often characterised by individual traits of personality, engaging or the reverse." Lord Macmillan, Law and Other Things (1937) 202.

[12] Cf. Kentucky Railroad Tax Cases (Cincinnati, N. O. & T. P. R. Co. v. Commonwealth of Kentucky), 115 U.S. 321, 334, 335, 6 S.Ct. 57, 29 L.Ed. 414. In United States v. American Trucking Associations, 310 U.S. 534, 544, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345, the court said: "Obviously there is danger that the courts' conclusion as to legislative purpose will be unconsciously influenced by the judges' own views or by factors not considered by the enacting body. A lively appreciation of the danger is the best assurance of escape from its threat * * *"; cf. Stone, J., dissenting in Morehead v. New York ex rel. Tipaldo, 298 U.S. 587, 633, 56 S.Ct. 918, 80 L.Ed. 1347, 103 A.L.R. 1445.

[13] There would have been no disqualification of the trial judge in Berger v. United States, 255 U.S. 22, 41 S.Ct. 230, 65 L.Ed. 481, if he had said, not that he was virtually incapable of being fair to German American citizens during World War I, but that he was aware of his prejudice against them and could therefore discount it.

The unrecognized, unspoken, bias is dangerous. Darwin said that he found it so easy to pass over cases opposed to his favorite generalizations that he made it a habit to jot down every exception which he observed or thought of, as otherwise he would be almost sure to forget it. It is difficult to agree with Rohrlich (17 Am. Bar Assn. J. 481) that it is wise for judges to suppress the expression of certain factors in the process of decision-making, that such suppression tends "to reduce the influence of those factors."

What Herbert Spencer said as to more general preconceptions has a bearing here: "The only reasonable hope is, that here and there one may be led, in calmer moments to remember how largely his beliefs about public matters have been made for him by circumstances, and how probable it is that they are either untrue or but partially true. When he reflects on the doubtfulness of the evidence which he generalizes, collected hap-hazard from a narrow area—when he counts up the perverting sentiments fostered in him by education, country, class, party, creed—when, observing those around, he sees that from other evidence selected to gratify sentiments partially unlike his own, there result unlike views; he may occasionally recollect how largely mere accidents have determined his convictions. Recollecting this, he may be induced to hold these convictions not quite so strongly; may see the need for criticism of them with a view to revision; and, above all, may be somewhat less eager to act in pursuance of them." Spencer, Study of Sociology (1873) 356–357.

[14] Wurzel, loc. cit., 298, 299.

[15] Wigmore, Principles of Judicial Proof (2d Ed., 1931) 960.

[16] The judge, if he is not careful, will carry "over into his finding more * * * of himself than he has discovered from the facts;" he will reshape "the real facts by utilizing his own attitude towards * * * life." Wurzel, loc. cit., 398. Wurzel says that there is a constant interaction between the "facts" and legal principles: "There is no sharply defined boundary between the principles applied by" the

and heard, it is his duty, while listening to and watching them, to form attitudes towards them. He must do his best to ascertain their motives, their biases, their dominating passions and interests, for only so can he judge of the accuracy of their narrations. He must also shrewdly observe the strategems of the opposing lawyers, perceive their efforts to sway him by appeals to his predilections.[17] He must cannily penetrate through the surface of their remarks to their real purposes and motives.[18] He has an official obligation to become prejudiced in that sense. Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions.

His findings of fact may be erroneous, for, being human, he is not infallible; indeeds, a judge who purports to be superhuman is likely to be dominated by improper prejudices. When upper court judges on an appeal decide that the findings of a trial judge are at fault because they—correctly or incorrectly—[19] think those findings insufficiently supported by relevant and competent evidence, that appellate decision does not brand him as partial and unfair. When, his decision reversed because of errors in his findings of fact or conclusions of law, the case comes back to his court for a further hearing, he will not, if he is the kind of person entitled to hold office as a judge, permit his previous decision in the case to control him.

These comments dispose of the issue here. Referee Olney has honorably discharged the duties of his office for many years. Nothing in his official career or in the record of this case justifies the suggestion that he did not and will not conform to the judicial standards of fairness as we have defined them. Judge Coxe, one of our ablest and most experienced trial judges, has refused to remove Referee Olney as Master in these proceedings. We see nothing to warrant us in interfering with Judge Coxe's discretion. Indeed, had he ruled otherwise, we would have been strongly inclined to reverse him.

■ 2. The District Court made an order vacating a notice given by certain of appellants of the taking of the depositions of witnesses whose testimony might bear on the issue of solvency, but with leave to these appellants to make a new application for taking such depositions after the petitioning creditors had put in their evidence. It is argued that this order constituted reversible error. We cannot agree. Under General Order 37, 11 U.S.C.A. following section 53, the Rules of Civil Procedure, 28 U.S.C.A. following section 723c, in so far as they are not inconsistent with the Bankruptcy Act or with the General Orders, are to "be followed as nearly as may be" but "the court may * * * modify the rules for the preparation or hearing of any particular proceeding." Accordingly, the order of which complaint is made was within the discretion of the District Court. No abuse of discretion appears.

---

judge "and the facts to which he applies them"; a "transition zone" lies "between rules and facts." Loc. cit., 390, 396–399. Cf. Perkins v. Endicott Johnson Corp., 2 Cir., 128 F.2d 208, 233, note 60.

[17] It will repay any judge to re-read carefully Aristotle's Rhetoric, which, in large part, is a manual on how to win a law suit, telling in detail the numerous ways to appeal to a judge's prejudices.

It is not without interest that one of the much-quoted statements in the Rhetoric on "natural" or "universal" law is contained in a passage in which Aristotle advises that, if the written law is against a litigant, he should urge that the case is governed by unwritten "universal law," but that, if the written law is in his favor, he should dwell on the dangers of resorting to such unwritten principles. See Aristotle, Rhetoric, Book I, Chapter 15.

[18] Some lawyers are seductively persuasive, recalling Plutarch's report of a remark of a contemporary about Pericles:

"Whenever I throw him in wrestling, he disputes the fall, and carries his point, and persuades the very men who saw him fall." Not that lawyers are to be critized for trying to be thus persuasive. Macmillan (loc. cit. 182) quotes some remarks made by Lord Eldon in 1822: "He (the advocate) lends his exertions to all, himself to none * * * It is for the court to decide. It is for him to argue. He is, however he may be represented by those who understand not his true situation, merely an officer assisting in the administration of justice, and acting under the impression that truth is best discovered by powerful statements on both sides of the question." Macaulay, six years later, said much the same in his essay on History, which is quoted in Aero Spark Plug Co. v. B. G. Corp., 2 Cir., 130 F.2d 290, 299, note 30 with critical comments on the over-emphasis of the "duellistic" aspects of litigation.

[19] Judicially, they are deemed to be correct. In fact, being human, they too may err.

3. Appellants also assign as error the refusal of the District Court to enter an order appointing special counsel to prosecute a claim against the Estate of James P. Linahan, deceased. Appellants complain that the lawyer for the debtor in possession is disqualified to act in this capacity because he is not disinterested. We have no occasion to explore that question of fact, since, in pending hearings before the Special Master to determine the solvency of the debtor, the matter of the value of that claim is in issue and appellants' lawyers, obviously not predisposed towards undervaluating that claim, are active participants in that hearing. Moreover, since the appeal was taken, the estate of James P. Linahan has stipulated that the court sitting in bankruptcy may, in that hearing, enter judgment against that estate for the amount of the value, if any, which that court may determine. The appeal on this issue is therefore moot and must be dismissed.

Affirmed, except as to the appeal from the order refusing to appoint special counsel, which appeal is dismissed as moot.