UNITED STATES of America

v.

Benjamin S. HAGGETT, Jr., Defendant.

No. 71 Cr. 816.

United States District Court, S. D. New York.

March 29, 1973.

Whitney North Seymour, Jr., U. S. Atty., U. S. District Courthouse, New York City, for United States; William B. Gray, Asst. U. S. Atty., of counsel.

Owen & Turchin, New York City, for defendant; Richard Owen, New York City, of counsel.

## OPINION

COOPER, District Judge.

### I. *The Motion*

Defendant moves for an order reducing[1] the sentence of five years imprisonment we imposed on June 1, 1972 after (a) a six day trial (January 18 to January 25, 1972) which resulted in a jury verdict convicting him of a one count criminal indictment (71 Cr. 816) and (b) defendant's conviction on a guilty plea to counts 8, 9 and 10 of a criminal information covering ten counts (72 Cr. 268). The indictment charged possession in June, 1970 of the contents of stolen mail;[2] in the criminal information, count 10 was brought for a violation on September 29, 1970 of the same penal section embraced within the indictment, while counts 8 and 9 charged interstate transportation of stolen securities in November and December, 1971.[3]

The sole supporting affidavit is by counsel for defense who urges us to (1) reduce the length of the prison term and (2) modify the sentence[4] so that the parole commission can give immediate consideration to defendant's application for parole and thus substantially reduce the customary waiting time of (one-third of the sentence). We are not asked to consider alternatives to imprisonment and, for the reasons set forth below, we regard such alternatives inappropriate here.

█ In support of his prayer for relief counsel advances only three points, the first two of which can be rejected immediately. They are that (1) defendant is presently 57 years of age and (2) he "has conducted himself in an exemplary fashion" since incarceration. Counsel suggests we make inquiry of prison officials who he is confident will support his estimate. First, notwithstanding defendant's age, which hardly can be considered today as advanced, we see no good and sufficient reason to interfere with the functions of the parole commission performed under law and under their oath of office. In evaluating defendant's parole application, the commission doubtless will consider his allegedly good deportment as an inmate

1. Rule 35, Rules of Criminal Procedure.

2. Title 18 U.S.C. § 1708; maximum penalty 5 years and/or $2,000.

3. Title 18 U.S.C. § 2314; maximum penalty 10 years and/or $10,000.

4. Title 18 U.S.C. § 4208(a).

which also earns credits to reduce the period of imprisonment, even absent parole. 18 U.S.C. § 4161. Moreover there is no good and sufficient reason presented which recommends that we direct immediate parole consideration; we do so only in exceptionally meritorious situations (e. g., a pathetic youth sadly enmeshed following conviction).

The third ground defense counsel briefly asserts, which reflects a limited appreciation of relevant factors in sentencing, precipitates this opinion. Here it is in its entirety:

> One additional factor the Court may wish to consider, and that is perhaps of some weight, is the subsequent sentence received by [a defendant specifically named (hereinafter X)] from another Judge of this Court of one year and one day, after conviction of transactions involving approximately twice the amount of face value of securities as were involved in Mr. Haggett's charges. Mr. [X], it should be noted, took the stand to deny guilt, whereas Mr. Haggett did not and indeed pleaded guilty to three of the four counts on which he was sentenced. Both of these men were first offenders under the law, and yet [X]'s sentence was one-fifth that of Mr. Haggett's.

With regard to these points alone, we did consider and give weight to the factors, in relation to others, that defendant did not testify and that his offenses resulted in his first criminal conviction. We further considered the not insubstantial amount of the securities involved. They were not, however, the only factors.

Moreover, it must be distinctly understood that "X" is a totally unrelated case to the one with which we deal here. Clearly counsel has not seen the confidential pre-sentence reports prepared by the respective probation officers and

presented to the judges who presided at the different trials in the cases sought to be compared. So very much is thus missing on which to predicate rational discussion (after all, we are not dealing with the price range of two containers of similar merchandise). We have begun to hear this same sort of complaint of inequality from other sources (and on other Rule 35 applications); while such inequality exists, in many cases there are neither facts set forth in support of it nor argument advanced to justify it —just disgruntlement that the sentence meted out in a case seems out of all proportion to that rendered elsewhere. We find it in a similar application for reduction of sentence now pending before us.[5] There is much to suggest a total unfamiliarity as to what "goes into" a sentence.

### A. Defendant's offenses

The indictment here followed a series of rapid events. On June 12, 1970 Bache & Co., a brokerage house in New York City, sent by registered mail to one of its customers in Queens County, New York, nine $5,000 City of Albuquerque, New Mexico, municipal bonds in bearer form. The letter and its contents, together with the safe in which they were kept, were stolen from the Jamaica (New York) Post Office on either June 13 or 14, 1970. The safe and portions of the stolen mail, including the letter to the Bache customer, were recovered in New Jersey several days later. The bonds were missing. Nine days later (June 23, 1970) defendant brought those same bonds to the Republic National Bank in New York City and pledged them as security against a $33,000 loan. Defendant told the bank officer there that the securities were part of the estate of his deceased mother; actually she left no securities whatever at the time of her death.

---

5. See, for example, United States of America v. Baratta, D.C., 356 F.Supp. 1280. Counsel for one of many defendants convicted there after a jury trial complains that his client received a prison sentence exceeding that imposed on any of the others, despite the fact that counsel knows absolutely nothing of the pre-sentence investigations relating to the co-defendants.

As to the three counts of the criminal information to each of which defendant entered a plea of guilty: Defendant unlawfully transported in interstate commerce from New York to Fort Lee, New Jersey, securities of a value greater than $5,000 on each occasion knowing they were stolen—count 8, on November 10, 1971 3,800 shares of Chromalloy American Corporation stock; count 9 on December 6, 1971 Virgin Islands bonds valued at $10,000. As to count 10, defendant had in his possession unlawfully the contents of certain mail addressed to the First National Bank, New York City, which had been stolen from a mail route.

### B. A general outline of defendant's profile

No dispute exists as to the following: Defendant was born 1915; his father, a school teacher forty years, and mother, a highly-respected housewife, reared their only child in a good home; served as altar boy during adolescence, as a youth, always attended church with mother; graduated in 1937 from one of America's famous colleges.

From 1937–1962 defendant worked steadily in banking and other financial institutions, first in the credit department as a new business representative, then a vice-president in charge of a banking branch office; in the last four years of that period as a vice-president of a large bank where he was put in charge of loans in the New York City area, at a yearly salary of $22,000.

He married in 1942; his three children attended college and lead self-respecting, highly creditable lives. He was divorced in 1969; no bitterness or ill-feeling ensued. His wife claims he always was a good provider, that she "did not grow with him" in that she failed to participate in the social aspects attached to his employment, knew little of his business affairs and hardly anything of his financial holdings.

Haggett's prototype makes a frequent appearance in our Court; let it be distinctly understood that he certainly is not atypical in making substantial inroads upon the peace and dignity of the unsuspecting public.

On May 28, 1968 a trial jury in this Court found Haggett guilty on fifteen counts of misapplying funds of a federally insured bank while its vice-president in charge of certain Manhattan branches, in violation of 18 U.S.C. § 656, and on one count of conspiracy to misapply said funds in violation of 18 U.S.C. § 371.[6] He received a sentence of five years (June 29, 1969). The conviction was reversed by our Circuit Court (January 26, 1971) and the case remanded for a new trial.[7] While the appeal was pending, defendant engaged in a series of illegal transactions which formed the basis not only of the indictment on which he was found guilty after trial before us, but the 10-count criminal information, to three counts of which he pleaded guilty.

So prolific were the extensive transactions defendant handled by the use of stolen stock certificates that from April, 1970 to December, 1971 through one bank account alone he pledged and later sold over $250,000 stolen bearer and municipal bonds; at other times during that period he pledged stolen securities for loans approximating the same amount. Our probation officer's report includes the belief held by responsible federal agents that Haggett acted as a "clearing house," or was closely associated with one or more acting in that capacity, for the disposition of stolen securities. While the trial developed considerable evidence of quality to point in that direction, we cannot regard it a finding of fact; if we did, we would have been constrained to seriously consider a substantial increase in the five year sentence imposed (maximum penalties for the infractions on which he

---

6. The indictment was filed October 10, 1963; defendant pleaded not guilty October 18, 1963.

7. United States v. Haggett, 438 F.2d 396 (2d Cir. 1971).

stands guilty before us total 30 years and $24,000 in fines).

The ease of his business approach, his quiet manner, an outward physical appearance of a mild, kindly man, lent support to his many ventures including his repeated representation that all these securities were part of his mother's estate; as mentioned above, actually she died leaving practically nothing.

Haggett offers no substantiated or credible explanation for his illegal way of life throughout the past many years, and nothing in extenuation of his deportment. In fact he furnishes us with nothing pointing to creditable instances throughout his life which would prompt a lighter sentence. His last legitimate work was in mid-1964. Up to that time he had "always maintained an upper-middle class residential program in desirable areas" (probation report); certainly nothing appears to even indicate financial stress. His grown family was economically secure; no one appears to have been financially dependent upon him (clearly his incarceration causes financial hardship to no one). Throughout his legitimate work period and since, he appears to have enjoyed good health. He was guarded in his interview (before sentence) with the probation officer; his own attorney appeared unable to assign reasons for favorable consideration at our hands.

Practically, the chances of restitution are nonexistent. As to the very strong likelihood that his banking career is now at an end, a factor we took into consideration on sentence, this defendant's convictions by trial and plea alone produced that result.

Of contrition, a precursor to meaningful rehabilitation, there is not a shred here. In fact he still maintains his innocence and blames his predicament on his reliance upon the representations of another that the securities in question were not stolen. At trial he offered proof on this score but it was rejected by the jury.

From the instant motion papers, it is apparent that certain fundamentals of sentencing often overlooked and the role of the pre-sentence investigation should be touched upon. Indeed, as demonstrated repeatedly in the courtroom, earnest counsel (after solid advocacy at trial) representing defendants at sentencing evidence uncertainty about what "goes into" a sentence, reflect misconceptions as to the judge's role in the process and miscalculate the renewed genuine interest and awareness of the entire sentencing phase of proceedings —its vital impression and effect on defendant and community alike. This prompts us to consider this occasion as appropriate to point up to both the defendant and the community the peril inherent in indiscriminate sentencing "in the blind" or sentencing which treats mathematical calculations and surface similarities as a substitute for an in depth consideration of deterrence, the individual offender's potential, his past, present, and predictable future relationship to the community, and the available sentencing alternatives.

## II.   *The Challenges Facing the Sentencing Judge*

In making a proper assessment of the materials (discussed hereafter) pertaining to sentence, the employment of such criteria as the law endorses for discovery of truth includes the factfinder's experiences with people from all walks of life.[8]

It is the opportunity and obligation of the community and the court to treat situations and conditions rather than

---

8.   For more than three decades of judicial service in this City, with the sentencing process a very frequent function throughout, we have observed the unfolding of an endless panorama of human misery made up of offenders charged with crime invariably saturated with moral turpitude.

These awesome experiences left indelible impressions which should help in forming an estimate of a defendant facing sentence. See annual reports of the Chief Justice, Court of Special Sessions, New York City, 1951–1960.

symptoms. We must recognize that a legally established degree of offense is an unsatisfactory index of moral potential; that the percentages of so-called cures obtained with our present pharmacopoeia of corrective ingredients and dosages are profoundly discouraging; and that treating offenses rather than persons produces considerable hazards to courts, communities, and offenders. If because of ignorance or lack of facilities the physician delays his patient's recovery, increases the man's pain and financial loss and perhaps weakens his basic physical structure, he leaves a good deal to be desired even though the patient lives.

The determined offender against the "peace and dignity of the people" presents a challenge not to be evaded. The right to move safe and unmolested through the city, to be secure at work and at home, to be protected against frauds and schemers, is the supreme luxury of civilization. For it the community pays a huge price, and is intolerant of failure or lag on the part of its agents and instruments. It cannot be patient with offenders while they threaten its security and comfort. Often there is "spread before [us] in all its inevitable sequency, * * * a story of the rake's progress more implacable than any that was ever painted by a Hogarth." The temper is one of generalized irresponsibility. We do not know how generalized irresponsibility is generated and how communicated. It has the qualities of a filterable virus. Its symptoms are obvious enough. The infected express themselves unmistakably.

The charter of courts is in the law. Having defined the intent of laws, courts must execute them within the tolerances which they permit. Laws define the acts which the community considers reprehensible. The community, in registering abhorrence by a punishment based on loss of freedom, is in effect alerting its members to the wisdom of self-control. Every crime represents a point of fracture between the personality of the delinquent and the social equilibrium which he had created to meet his needs. Arrest tends to demonstrate that the situation had become unsatisfactory to society or to the delinquent, or to both. What has cracked up is the criminal's organization of social forces that provided what he wanted, at a price.

We hold our legal processes in high regard as instruments of moral instruction, discipline and inspiration. It makes a difference how people are arrested, and charged, and bailed; what they do between arrest and trial; who helps or does not help them; what future is presented to them; what aids offered to realize it; what supports an attorney enlists for them, or medicine supplies; how the judge interprets to offenders the attitude of society toward their faults; the character of the discipline measured out, and the climate of its administration; most important of all, how the offender is assured that he is not cast out of society, but he can elect to stay out. We hold that all these values inhere in the legal process and can be realized.

Without taking full cognizance of the pulsating problems of life which lie behind names, charges and numbers of cases, no real estimate of what confronts us here can be gleaned. It is in the courts that the dramas behind the figures presented in the annual reports of the Federal Bureau of Investigation, and in the local police reports on which the national profile is based, unfold and take on life. And it is from the court records that cities, towns and villages might, if they wish, learn what kind of crimes are committed, who are committing them, which conditions breed or facilitate certain crimes, and what community prophylaxis is called for to prevent (by promoting community moral health and so capacity to resist) situations injurious to the commonweal.

The health of the community lies in the absence of disease rather than in its resources for isolating the sick and providing for their cure. Crime is begin-

ning to be understood as an aspect of man's mental-emotional-moral nature. This nature, assailed by many forces both within and without his bodily frame, is susceptible to many infections. Some are capable of destroying their victim, and more important still, of infecting others. While public health authorities have learned to follow a typhoid or other "carrier" from state to state, even across the nation, once they have become aware of its existence, we in the law still follow the determined offender through his fingerprints, but not legions of other law breakers, especially young adults, in their most infectious stage.

The Court must be able to identify the offender with good moral potential who can be safely returned to the community to line up with the orderly citizen, from the hair-trigger, perverted or psychopathic offender who needs institutionalized care.

Many offenders have a long potential for good as well as for evil. But the potential is in them—not in their act. Sentencing the offense rather than the person plunges certain offenders headlong into hatred, revolt, community-repudiation—into something approaching self-destruction, i. e., moral suicide. Society then has lost a son, and gained a wastrel whose depredations have been known to affect the lives of many and to cost millions.

■ Regardless of the degree of crime, the extent of character deterioration must be inquired into by the Court so as to ascertain the probable nature of the remedial measures needed (including confinement in an appropriate institution) to meet the condition determined. We believe that proper "post-operative care" requires the same careful scrutiny as the steps taken during the trial.

### III. The Pre-Sentence Investigation

After interminable hours of listening to charges and countercharges, quibbling and evasions, painstaking establishment of facts and the final officially estab-lished legal description of an act, judges often find themselves merely at the beginning of what they should know in order to mete out an enlightened sentence —fair to defendants and protective of the community. Not until they have time and the requisite professional facilities (the equivalent of x-ray pointing the general direction) whereby they can know who the persons are whom they sentence, will they be in a position to know who should be incarcerated and where and for how long, who should be guided under court supervision, and how to prevent re-infection.

Only to the degree that a punishment "fits" the offender will it "fit" the crime. When a judge is constantly beset by fear that a sentence he is about to impose is not apposite, his professional sense is outraged. It is not impossible for a sentence to be a greater injustice than the criminal act, like putting a child with a common cold into a small-pox ward for treatment.

Today, we speak less of punishment as retributive, as deterrent, or as regenerative. We are more aware that in a large number of cases, the real factors that brought about the crime can not be properly treated alone by a given number of dollars in fines or of days in prison.

As an instrument for prompt hearings the court can fall from asset to liability if it lacks the essential means for determining the circumstances out of which a crime has grown, the degree of the defendant's educability, the best and quickest means of returning him to or removing him from the community. It is all too easy for the court to deteriorate into a hurrying panorama of human misery if it relies when sentencing exclusively on the bare facts and the law applicable to those facts.

■ A function of sentencing judges is to be aware of, and to contain, the tensions built up through interaction of the community, the complainants and their friends, the police, attorneys, and probation, prison and parole officials.

The sentence should safeguard and harmonize the proper interests of all these groups. Because judges, like physicians, can be more aware of the narrow choices possible within given situations than are the persons most vitally affected, the dilemmas and the drama of sentencing can be almost as distressing to them as to the sentenced. "The law does not require a judge to anesthetize his emotional reflexes.[9] The analysis and time required is often more demanding than most complex issues of law and fact during trial. And, like physicians, judges must depend heavily on the frequently uncertain recuperative powers of the convicted and, in appropriate cases, trust to a reoriented will to stabilize character. The resources of the court should be sufficient to support delinquents who demonstrate a will to moral recovery.

Imperative to enlightened sentence is a thorough inquiry concerning the defendant which embraces complete and clean answers to such questions as, Why did he commit his act? What was there in his experience to turn him criminal? What of his home, his relations with parents, siblings and neighbors? With social institutions? With peer groups? With friends and boon companions? Who influenced him and after whom did he mould himself? What variety of activities did he participate in? Most important of all, what variety of opportunities were open to him? Did he participate in his culture? What interests did he then have? What skills? Whom did he love or hate? Inadequate answers to these and related questions pose the dilemma of his future deportment. It takes time and study to prevent reinfec-tion by a truly therapeutic and curative supervision.

And further inquiry: What of the offender's parents and their relation to each other, of his brothers and sisters and relatives? What of the neighbors and the neighbors' children? Was strife and thievery, as with the Spartans, the "mode" of the neighborhood, a black eye a decoration and not a reproach? What of the cultural and civic resources of the neighborhood? The religious institutions in which moral values and codes are taught, exemplified and highlighted with festival; the school's playgrounds, political clubs, police, sanitary and other services—how adequate were they to help form a character?

Those courts without the essential tools for making an appropriate disposition further endanger both defendant and community. In most state courts with appropriate jurisdiction across the land, funds for this vital purpose are either woefully inadequate ("band-aids" to dress deep wounds) or non-existent.[10] We pay dearly for injecting "bigness" into the house of the law. Said Judge Learned Hand, "If we are to keep our democracy, there must be one commandment—thou shalt not ration justice." After all, a legally established degree of offense is an unsatisfactory index of moral potential; in many cases the factors that induced the crime neither vanish nor diminish by a fine or imprisonment.

What we have said hereinabove as to a trial judge's experience with factual precipitates distilled from a mass of evidentiary matters, applies with equal force in making a proper assessment of the trial record adduced. The trial in-

---

9. We subscribe to what appears in In re Linahan, 138 F.2d 650, 652 (2d Cir. 1943): Only death yields complete dispassionateness . . . . Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilictions, becomes a passionless thinking machine."

10. Working Papers for National Conference on Criminal Justice, January 23–26, 1973 L.E.A.A.; Task Force on Administration of Justice, The President's Commission on Law Enforcement and Administration of Justice (1967).

variably reveals the true depth of iniquity reached by a convicted defendant, the extent of character deterioration, the existence of vicious habits and depraved evaluations, or, on the other hand, the unexpected strength possessed by the offender.

It is in those courts with adequate professional services that early identification of the determined offender can be made, and thus lessen the period of suffering for the community while he is establishing his intention by a long series of unreported, unrecognized and unpunished offenses. The stake which the community has in the potential recidivist is that he should not actually become one. Then, too, there is often very little difference in the offense and in the superficial attitudes of persons widely different in their human needs. Ineptitude in their treatment can go far in miseducating an entire generation. It is among the tragic limitations of our humanity that faced with evil we must willy-nilly "treat" the condition first, "prevent" it next, and at long last, by understanding, renounce its charms.

## IV. *Some encouraging signs in sentencing*

We must look to and treat situations or conditions rather than symptoms.[11] The court must know the situation of which the offense is only a symptom. Resources for description, diagnosis, and treatment are imperative if sentences are to reflect enlightenment and not a disastrous groping in the dark. Indeed, this approach surely "pays off." We have heard offenders retrace the bitter steps of their downfall, the throbbing pause of uncertainty following arrest when life seemed to stand still, including the sorrow of parents and the apprehensiveness of friends, the scorn and withdrawal of neighbors, the sense of being trailed.

The therapeutic impact of arrest, fingerprint, incarceration—this thorny and tearful path for many offenders—creates an unwanted but deep indentation. Often it is sufficient to stabilize a defendant for the rest of his life against almost any temptation to overt action. He emerges from the ordeal with an overwhelming conviction that the nets of the snarer are all about him.

After all, the delinquent has defied the community. He is threatened both in depth and extent, and he is insecure about his own integrity. Those who really wish to help him must be prepared to participate in recriminations, discouragements, in false starts, failures, hard ascents and periods of slow gain.

Frequently we have witnessed the moral rejuvenation of many of them after contrition had begun to set in (an estimate made by the judicial factfinder): building a value system; the gradual mastery of shame, false pride, fear, hatred; successful participation in socially rewarding activities; the balm of being free of surveillance. And once in a while, we have been privileged to see the process as a whole, from its incubation through the stages of growth, of catastrophy, of therapy, of recovery, and of reintegration—with the scars, it has to be said, plainly visible on the epidermis of both offender and society, but beginning to fade. The stories of some of these people resemble a kind of moral tight-rope walking over a precipice—so amazing are the powers of self-healing given, of course, the slightest encouragement. In the appropriate case, all this can be realized and rehabilitation become a reality without confinement where now imprisonment would appear the advisable course.

The problem, again and again, relates not alone to what such an offender has done, but to what had he become? Giv-

11. See "Guides for Sentencing" and other expositions on sentencing by the Council of Judges of the National Council on Crime and Delinquency; that associa- tion's published material relating to sentencing. Also sentencing institute reports in Federal Rules Decisions.

en his present condition, how do you go about certifying that such a person, once toxic and infectious, might really now be charged with positive health? Repeatedly we have witnessed a defendant erect a platform of self-deceit and on it go down to defeat, and while clinging to it, like the Phoenix, ascend and conquer.

The Court, insofar as it is able to reflect the immutable will of society to be protected against willfulness, and society's readiness to receive those healed of their moral infirmities back into the community, must be counted among our most important instruments of moral regeneration.

Lamentably true it is that all of us concerned with justice disregard this plight of such defendants to our common peril. Daily our national court calendars overwhelmingly insist that we denounce "with unwearied and even troublesome perseverance" [12] the haphazard, indifferent approach to the imposition of sentence.

Such is not, we believe, the situation in the case before us. Defendant was examined with care before sentence was pronounced. A detailed and thoughtful probation report, of the kind we have come to expect from our probation officers (theirs indeed is a profession), was studied and reviewed by us with care.

We heard and weighed all defendant and his counsel had to say. We had before us solid material on which, within human limitations, we could predicate an enlightened sentence in this case. Hopefully we tried our utmost to make the sentence just and proper not alone to the defendant but to the other represented party to the litigation (so often forgotten)—the community which now regretfully has the added expense of paying for his incarceration and making available rehabilitative facilities if the defendant seeks the opportunities they provide.

## V. *Disposition*

■ On the instant application, we have reexamined the sentence imposed in light of all the relevant factors, not just those asserted by counsel. We have, moreover, paid especial attention to the claim of inequality in sentencing and found it baseless in this instance; we have emphasized the great value in post conviction study of offenders, aided by pre-sentence investigations of high order, which, among other significant benefits, would avoid the inequality claim so often properly based. We are constrained to let the sentence stand, for neither good nor sufficient reason exists to do otherwise. Accordingly, the application is denied in all respects.

---

12. Editorially in The London Times almost 200 years ago and pertinent to our endeavor here: "The greatest tyranny has the smallest beginnings. From precedents over-looked, from remonstrances despised, from grievances treated with ridicule, from powerless men oppressed with impunity, and overbearing men tolerated with complacence, springs the tyrannical usage which generations of wise and good men may hereafter perceive and lament and resist in vain.

At present common minds no more see a crushing tyranny in a trivial unfairness or a ludicrous indignity than the eye uninformed by reason can discern the oak in the acorn or the utter desolation of winter in the first autumnal fall.

Hence the necessity of denouncing with unwearied and even troublesome perseverance a single act of oppression. Let it alone and it stands on record. The country has allowed it and when it is at last provoked to a late indignation it finds itself gagged with the record of its own ill-compulsion."