**Frank PALLATTA, Petitioner,**

v.

**UNITED STATES of America, Respondent.**

**No. 80 Civ. 4099 (IBC).**

United States District Court, S. D. New York.

Oct. 22, 1980.

Lopez & Blossner, New York City, for petitioner; Frank A. Lopez, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S. D. N. Y., New York City, for respondent; Dominic F. Amorosa, Asst. U. S. Atty., New York City, of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

The defendant Pallatta, now serving a sentence of thirty years which we imposed almost five years ago (December 3, 1975) following his trial before us (which resulted in his conviction by jury on four counts of conspiracy to violate the narcotics laws and the distribution of heroin and cocaine), now applies for an order setting aside the sentence imposed and directing that he be re—sentenced before "a different judge." We deny the application in all respects.

His present counsel on the instant application maintains "there is a constitutional infirmity in the sentencing process requir-

ing the vacatur of the sentence [and] A gross Constitutional Violation" (affidavit of Frank A. Lopez, Esq., verified July 22, 1980, pp. 1, 11) in that, before sentence was imposed, his presentence report (commonly referred to as the probation officer's report submitted to us in strict confidence) was not disclosed to him or his counsel, pursuant to Fed.R.Crim.P. 32(c)(3)(A) effective December 1, 1975 (3 days before sentencing) which reads:

> Before imposing sentence the court shall upon request permit the defendant, or his counsel if he is so represented, to read the report of the presentence investigation exclusive of any recommendation as to sentence, but not to the extent that in the opinion of the court the report contains diagnostic opinion which might seriously disrupt a program of rehabilitation, sources of information obtained upon a promise of confidentiality, or any other information which, if disclosed, might result in harm, physical or otherwise, to the defendant or other persons; and the court shall afford the defendant or his counsel an opportunity to comment thereon and, at the discretion of the court, to introduce testimony or other information relating to any alleged factual inaccuracy contained in the presentence report.

Another vital section of Rule 32, (c)(3)(B), is not mentioned. We shall deal with it hereinafter.

From Pallatta's presentence investigation we learned he was 43 when we imposed sentence; good upbringing in a closely knit family; no schooling beyond 8th grade; no verifiable work record; stable marriage, one child. We distinctly recall this particular case and the elements that precipitated the sentence we imposed. Not a single item in his presentence report influenced or entered into the total sentence we pronounced upon him. After studying and reflecting upon Pallatta's presentence report in full, we resolved to (and ultimately did) predicate the sentence imposed exclusively upon the vast extent of defendant's nefarious practices which he constantly pursued with impunity over a substantial period of time,

his long-standing anti-social behavior and his character as revealed in great detail at trial. Further, we concluded that his presentence report "might result in harm" as set forth in (A) of Rule 32 cited above.

\* \* \* \*

The jury rendered its verdict on October 24, 1975 (the trial started September 24, 1975). The defendant Pallatta and six of his co-defendants (Bolella, DeLutro, Gwynn, Lucas, Magnano, Soldano) were found guilty of various counts of a seventeen count indictment which in essence charged: Count 1: Conspiracy to Violate the Narcotics Laws (21 U.S.C. 846); Counts 2–17: Distribution and Possession With Intent to Distribute Heroin and Cocaine (21 U.S.C. 812, 841(a)(1) and 841(b)(1)(A); 18 U.S.C. 2.) Maximum penalties provided: 15 years and/or $25,000 fine on each count; minimum 3 years Special Parole Term if imprisoned.

We commented briefly on the scope of the evidence adduced at trial when six[1] of these defendants appeared before us for sentence on December 3, 1975:

> The convicted defendants were part of a tremendous network in this metropolitan area. Indeed, so far as our personal observations are concerned, this case is one of the largest domestic heroin cases in the history of narcotics law enforcement. Although the identities of the foreign importers and the initial domestic recipients of the heroin in this case remain concealed, the convicted defendants represent a chain of distribution.

> The prosecution of Magnano, Pallatta, DeLutro, Soldano and Lucas was the culmination of literally thousands of hours of intensive investigation by representatives of the United States Drug Enforcement Administration over a very ... substantial period of time. Magnano, Pallatta and Bolella have been engaged in distributing heroin, says the evidence, from the beginning of the previous decade.

The trial proof established that Magnano, Pallatta, and Bolella were receiving during the course of the conspiracy highly confidential information relating to Federal narcotics law enforcement activities which was channeled to them from or through a law enforcement official. To date the identity of this corrupted official remains unknown.

We have presided over trials involving the sale of substantial quantities of narcotics. Never, however, on a scale as extraordinary as this with its enormous quantities of heroin bought and sold on an almost daily basis. The activities of this group emphasize the overlord and regimental tiers of organization, all governed by tight maneuvers and bold enough to successfully avoid governmental detection of which they were constantly apprehensive and aware. Nor have the important operational details of their cruel exercise come to light even at this late date. Let's face it, so inhuman, ruthless and cold-blooded was their approach to the execution of their nefarious schemes that we sat aghast at the unfolding of the enormity of their horrifying indifference to life's values. The holocaust of misery, the dreadful terminus of life for legions following the vast narcotic operations revealed herein [are] too horrifying even to contemplate.

Although the heroin sold by this large narcotic drug organization to Perna and his partners was diluted heroin, the proof clearly shows that Magnano, Pallatta, Bolella and their partners were regularly receiving large shipments of pure heroin which they in turn diluted and resold to Perna and his partners.... They have been in that business a great number of years.... The evidence [at] trial ... showed that this defendant [DeLutro] sold Verzino, Perna and Malizia over ten pounds of pure heroin in November of 1973, and was paid a quarter of a million dollars in cash. It also showed that DeLutro had access to even greater amounts of pure heroin at the time and that he

---

1. Lucas was sentenced on a later date.

was active all the way back to the early 60s.[2]

### At sentence

At sentence we did our utmost to follow the mandate of Fed.R.Crim.P. 32(c)(3)(B) (not mentioned in the moving papers now before us):

> If the court is of the view that there is information in the presentence report which should not be disclosed under subdivision (c)(3)(A) of this rule, *the court in lieu of making the report or part thereof available shall state orally or in writing a summary of the factual information contained therein to be relied on in determining sentence, and shall give the defendant or his counsel an opportunity to comment thereon.* The statement may be made to the parties in camera. (emphasis added)

Repeatedly throughout the 84 pages of sentencing minutes we endeavored to observe the imperative pronounced in Rule 32 as set forth immediately above. Example:

> [T]he Court will point up each and every point that we take into consideration on the sentence. There are no other factors other than those that I shall announce which enter into the Court's deliberation.... It has been my invariable practice when I take into consideration some factors that were not revealed upon the trial, or not brought to my attention and to the attention of counsel and the defendant himself, to make mention specifically of those factors so as to give counsel and the defendant an opportunity to meet what the Court considers new material called to the attention of the Court.

In this case, however, I have already said, and I repeat I shall bring out the factors which the Court is considering and only those factors which enter into our deliberations on this sentence.[3] (pp. 3, 5, 6)

In line with that endeavor, we attempted to delineate the factors in the presentence reports affecting each defendant which did or did not impress us; that the strength and weakness of each defendant differed.[4] Thus, we commented on a serious point made in two of the presentence reports (not Pallatta's), that those defendants were also engaged in loan sharking.

> [T]here is the allegation that the defendant was deeply involved in loan sharking. I do not and will not give that any weight whatever.... There wasn't a thing brought out in the course of this trial on loan sharking. What am I going to do? Conduct a hearing to see whether or not the defendant engaged in loan sharking? Am I going to give weight to an assertion by—made in good faith—by the Government that the defendant we learn was involved in loan sharking on a significant scale? The answer is, no. You want to call the Court's attention to something that amounts to a crime? Prove it. And don't get it in that way. So that with me it has always been academic. You just throw that out as I did here in the instance I gave you.

> And there have been other points that I have disregarded. And that is the reason I say that I am going to announce just what factors entered into my deliberations, and only those factors that brought about my determination. (pp. 6, 7) [As to

---

**2.** Unless indicated otherwise, all references herein are to Sentencing Minutes; the above may be found at pp. 48–50, 55, 57, 60, 61.

**3.** Further: In dealing with this defendant we incorporate as though recited word for word everything we have already said since we began to speak with regard to this sentence as well as the companion sentences. And such is the full intent of the Court with regard to every defendant coming on for sentence in this case. Each one of those words I have uttered are considered repeated with regard to each one of these defendants. (p. 57)

**4.** At page 53: "[We] must mete out sentences based exclusively on each human being. I have seen remarkable strength shown by almost unspeakable characters, and I have seen the windup in the gutter of those who looked like spellbinders for the future good of themselves and the community. And so we do address ourselves to the strength and weakness of each defendant. And the sentence is addressed not only to the crimes of which they stand convicted, but to their behavior pattern as human beings over a substantial period of time."

DeLutro] Here the probation report reveals loan-sharking. We disregard that in its entirety. It does not enter into our deliberation for one split second. (p. 60)

Another example: Our comment with respect to DeLutro's "associates" as revealed in his presentence report:

I don't want to speak about what they say—that is, his associates. I don't know that this is so. And so I am not loading him down with it. I will say his associates are among the worst criminals. I don't go for it because it isn't supportive enough. And so I give that no weight. If I gave it weight, I would give him the maximum, which is sixty years. [As to Soldano] The report mentions his association with notorious criminal characters. I have not given that any consideration, because of unsupported proof. (pp. 61, 68)

We emphasized the good points along with the bad: Magnano's prior criminal record was "of a comparatively minor character." (p. 54) Bolella's military record: "He did desert the army. After apprehension he effected supervision and justice."[5] (p. 62) As to the honorable discharge of Soldano: "He served in the United States Army from May 3, 1943 to November 19, 1945. He served overseas in the European theatre of operations. I will give him credit for that. . . . If it weren't for [that] I would add five more years to the sentence." (p. 68) A similar comment was made about Gwynn's lectures to potential future offenders: "I am going to give you credit for helping out young people. That was the good side of you. And you meant it; it wasn't a piece of fakery." (p. 71) As to Gwynn's complaint that he sorely needed dental treatment, we addressed his counsel: "Mr. Lang, you write me a letter and I will send a letter to the warden. I want top

professional care. And free of charge." (p. 84)

We afforded each defendant and his counsel the opportunity to speak freely, fully and without interference. Our effort to keep "the record straight"—to make certain that our estimate of each factor entering into the sentencing process was correct—is reflected in the sentencing minutes. For example:

Our comments to the defendant Bolella included the statement that his work record was unverified. His counsel contended to the contrary.

THE COURT: [L]et me . . . get the full report so that I will not be doing an injustice consciously . . . Mr. Epstein, you are on your toes, as you should be, and I am grateful to you because you are correct. What I meant to say, and what is revealed after I looked at the probation report, is that the Probation Department was unable to verify any of the employments . . . no recital that they [probation department] verified it. And it is not your fault that they didn't. That is their job. And so I am not holding it against him. I am accepting this statement and your own comments with regard to his employment. And I order stricken from the record my comment that in his case I have been put on notice that his employment was a sham and a fraud. (pp. 64, 65)

In sum, as to each defendant at sentence, we mentioned the factual information contained in his respective presentence report upon which we relied in deciding an appropriate sentence—as we saw it, fair to the accused and accuser alike.

We emphasized the judge's heavy responsibility at sentence.[6] We thanked counsel

---

5. Later in the proceedings, the attorney for DeLutro stated that his client had not "deserted." Whereupon we stated: "the Court invites you to submit proof with regard to it on an application for reduction of sentence." (p. 75)

6. "No heavier burden, with its accompanying strain, comes to the trial judge than the imposition of sentence. It is always a fretful experi-

ence. We have exerted ourselves to the utmost to mete out sentences here which consider every scrap of available information relating to each defendant as a human being as well as the crimes of which [he] stand[s] convicted. (p. 50) I have spent hours looking at these papers, and weighing them and thinking about them, and I let it come into [the] food which I ate. I know the general conception, the judge has a

"who feelingly, and not as mouthpieces, have spoken with their hearts as well as their minds. More than that no client can ask." (p. 46)

We regard it appropriate at this point to quote a comment made by the Government of which we were totally unaware throughout the trial and sentence: "[There was a] history of violence which attended the prosecution . . . ."[7]

Primarily because the trial record reflected the depths of iniquity in which those convicted carried on their nefarious practices, we were constrained to and did impose sentences ranging from eight to forty years.

### Pallatta sentenced

. It might prove helpful if we set forth all that we said to this defendant before his sentence was pronounced:

This defendant was found guilty by a jury of counts 1, 2, 3 and 4. Reference has already been made to his prior criminal record. When he was a young man of seventeen he was arrested and convicted of a charge of burglary. He was placed on probation for a year. And when he was twenty years of age, again burglary, two—and—a—half years.

Here, too, the parents eked out a living. It was a closely knit family. There was love, there was attention, as much as folks can give who had to go around pretty much in rags in order to be able to help the children. I know that picture. I was a part of that picture. He, too, has a child; he, too, has the accolades from his

wife, 'a wonderful husband and a good provider.'

There has been no verifiable history of employment since 1960. As to the military, he never served. To quote him, 'I went to jail instead.'

In dealing with this defendant we incorporate as though recited word for word everything we have already said since we began to speak with regard to this sentence as well as the companion sentences. And such is the full intent of the Court with regard to every defendant coming on for sentence in this case. Each one of those words I have uttered are considered repeated with regard to each one of these defendants.

I must repeat again that Pallatta, Magnano and Bolella, along with their partners, sold approximately 46 kilograms of heroin to Perna, Malizia and Verzino, and they received in excess of a half million dollars from Perna and his partners. Although the heroin thus sold was diluted, Pallatta, Magnano and Bolella and their partners received large shipments of pure heroin which they diluted and resold. They have been in that business a great number of years. (pp. 56, 57)

### The Government's response

We find persuasive the arguments raised in the Government's opposition to the instant application (affidavit of Assistant United States Attorney Dominic F. Amorosa, verified September 9, 1980). We refer particularly to: 1. "[P]roof established

---

better lunch after he has handed out time. I know that. We can't be bothered with that kind of drivel. You go according to your conscience, and you go according to what you think is right, and you do it. You have to live with it. This is the ugliest phase of a judge's work. . . . It is my duty. . . . [W]e do not take this lightly, that we are bound up with it, that we become personally involved so to speak." (pp. 81, 82) Perhaps we should have added: "Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine." *In re Linahan*, 138 F.2d 650, 652 (2d Cir. 1943).

7. The Government's opposing brief in *United States v. Magnano*, 543 F.2d 431 (2d Cir. 1976), *cert. denied*, 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977) stated (at p. 130 and f.n.): "Prior to trial defendant Gwynn was felled by two bullets in the back in an apparent and unsuccessful attempt on his life. Also prior to that time eight defendants became, and to this date remain, fugitives. On March 13, 1976, defendant Chapman, the only defendant as to whom the jury was unable to agree upon a verdict, was murdered by two bullets which lodged in the back of his head. Both crimes of violence are unsolved."

that he was a central figure in a massive heroin distribution network." 2. No satisfactory proof whatever that defendant made a request to see his presentence report–imperative under Fed.R.Crim.P. 32(c)(3)(A). 3. The defendant "makes no contention that he was prejudiced at the time of sentence because of failure to examine it. This failure to allege prejudice was almost certainly based upon the Court's repeated and unequivocal statements at sentencing that each and every factor which was inherent in the Court's sentencing determination would be openly revealed to the defendant and his counsel at sentencing. Thus it is clear that although the Court read the presentence report, and may have considered portions of it in imposing sentence, those portions were revealed publicly at the time of sentence, and counsel was given a full opportunity to respond to such matters. The purpose of the Rule was therefore completely satisfied here. See *United States v. Virga*, 426 F.2d 1320, 1323 (2d Cir. 1970), *cert. denied*, 402 U.S. 930, 91 S.Ct. 1530, 28 L.Ed.2d 864 (1971); *United States v. Holder*, 412 F.2d 212 (2d Cir. 1969)." 4. "[I]f Pallatta or his trial counsel believed for one instant that he was prejudiced at sentence by the failure to disclose, this issue would have been asserted previously in the trial court and on appeal. Indeed, this matter should have, and could have, been raised on direct appeal from Pallatta's conviction." 5. "[T]he current motion is an attempt to raise a non–existent issue to defeat a just and well–deserved sentence, the premise of which is amply demonstrated by the Court's recounting of the horrendous evidence against Pallatta at sentencing." 6. Pallatta's codefendant Bolella through counsel made a specific request at sentencing to examine his presentence report. We denied the application. Bolella "raised this identical issue on direct appeal from his conviction. The Court of Appeals rejected Bolella's argument. *United States v. Magnano*, 543 F.2d 431 (2d Cir. 1976), *cert. denied* 429 U.S. 1091, 97 S.Ct. 1100, 51 L.Ed.2d 536 (1977). The Court of Appeals, in rejecting Bolella's argument, did not even discuss the issue.... [thus] dispositive of this entire issue ..." (Amorosa affidavit, pp. 1–4)

It is quite likely, we suggest with great respect, that the arguments advanced by the Government on appeal, may have had some impact (in whole or part) on our Circuit Court, which may indicate, as the Government argues, why the appellate court said absolutely nothing on that issue. For that and other reasons, we believe it pertinent to refer to portions of the Government's opposing brief on the appeal by Bolella to our Circuit Court: "The trial court denied [Bolella's] request ... but stated clearly that each defendant would be informed of each and every factor, and only those factors, that the court was relying on in the determination of that defendant's sentence.... The sentencing procedure employed here was within the requirements of Rule 32(c)(3)." Government's Brief at 128. "[T]he disclosure requirements of the Rule were satisfied when the sentencing judge .... made a thorough oral summary of the evidence against each defendant and disclosed the factual information contained in the presentence reports that he relied on in imposing the sentence, including the defendant's age, prior criminal record, if any, military service, family background and employment history." *Id.* at 130, 131.

Continuing with the Government's brief in Bolella's appeal: "[T]he trial court disclosed all the reasons and a summary of the factual information contained in the presentence reports on which the sentence was premised.... [T]he procedure employed clearly satisfied the requirements of Rule 32(c)(3). Cf. *United States v. Washington*, 504 F.2d 346, 349 (8th Cir. 1974); *United States v. Foss*, 501 F.2d 522, 530 (1st Cir. 1974); *United States v. Gorden*, 495 F.2d 308, 310 (7th Cir.), *cert. denied*, 419 U.S. 833, 95 S.Ct. 58, 42 L.Ed.2d 59 (1974); *Johnson v. United States*, 485 F.2d 240, 242 (10th Cir. 1973); *United States v. Guzman*, 478 F.2d 759, 761 (2d Cir. 1973); *United States v. Brown*, 470 F.2d 285 (2d Cir. 1972); *United States v. Virga, supra*. Accordingly, the sentences imposed by Judge Cooper should not be disturbed." *Id.* at 132–33.

On appeal Bolella relied on *United States v. Brown*, 470 F.2d 885 (2d Cir. 1972), *cert. denied*, 411 U.S. 936, 93 S.Ct. 1913, 36 L.Ed.2d 397 (1973) "in support of his request for resentencing. [I]t should be pointed out that in *Brown* the sentencing judge, having refused to disclose the presentence reports, proceeded to impose a three year sentence without any comment or explanation on the record." *Id.* at 133 n.*.

### No application was ever made

The only reference (in the moving papers now before us) to movant's application to see his presentence report is to be found in a footnote on page 6 of his present counsel's affidavit. It reads: "Counsel for petitioner, Jay Goldberg, Esq., informed the writer that before sentence he asked the Court for the pre–sentence report and was informed that the court will not allow disclosure of the pre–sentence report to either counsel or defendants."

When the sentencing took place, counsel for Bolella requested permission to examine his presentence report. (p. 3) This encouraged counsel for DeLutro to make a similar request. (p. 5) We denied their applications. Thereafter (pp. 15–18) Pallatta's counsel addressed the court; he did not say a word (then or throughout the entire proceeding) about his client's presentence report.

Shortly before sentence was imposed, the attorney then representing movant filed with us Defendant's Pre–Sentence Memorandum. In its opening statement we find, "We submit the following information as an aid to the court in the imposition of a just sentence." Its presentation is subdivided: personal history, family composition, home and neighborhood, employment and resources. The "conclusion" includes, "[W]hat we have attempted to present to you is a side of Frank which may not have been available to you previously." Suffice it to say, no mention is made therein of the presentence report in any connection whatever—not even the need of, or a request for, it.

Finally, a thorough recent search of our file in this case finds it devoid of anything touching in any form upon a request to see the presentence report. Further, at our direction, the probation office made a thorough search of its files during the past two weeks. Nothing was found having any bearing whatsoever on a request in behalf of Pallatta to examine the presentence report relating to him.

We conclude unhesitatingly that on every aspect of the total sentencing process involving Pallatta–before, during and after its imposition–no satisfactory proof is presented that an application in any form was ever made to examine his presentence report. We feel confident we fulfilled and complied with the law's mandate.

### Conclusion

We find the instant application totally devoid of merit and accordingly deny it in every respect.

SO ORDERED.