**UNITED STATES of America,**

v.

**Robert M. POYNTER, Defendant.**

**75 Cr. 593 (IBC).**

United States District Court,
S. D. New York.

March 31, 1980.

Robert B. Fiske, Jr., U. S. Atty. for the Southern Dist. of New York, New York City, for United States of America; Betty Santangelo, Denise L. Cote, Asst. U. S. Attys., New York City, of counsel.

Lavin & Batchelder, New York City, for defendant; Harry C. Batchelder, Jr., New York City, of counsel.

OPINION

IRVING BEN COOPER, District Judge.

On August 17, 1976, following the defendant's guilty plea to two counts of Failure to File United States Individual Income Tax Returns in violation of 26 U.S.C. § 7203, we imposed a sentence of one (1) year on each of Counts 1 and 2; execution of sentence was suspended and defendant placed on probation for three (3) years, subject to the standing probation order of this Court. A special condition of probation was

that defendant pay $11,000 in back income taxes at intervals determined by his Probation Officer. Further, that he report to his Probation Officer every sixty (60) days. In light of the facts of the case (see *infra*), we emphasized that the probation process must be strict at all times, with quarterly probation reports submitted to the Court unless ordered otherwise.

In open Court on August 16, 1979 (three years to the day after the imposition of sentence), defendant admitted to violating the most serious provision of his probation sentence by associating with known criminals and persons of ill repute. We remanded him for sentence and on September 6, 1979 we revoked probation and imposed a jail term of two years; defendant appealed therefrom; our Circuit Court on February 22, 1980 left our order undisturbed.

Pursuant to Rule 35 of the Federal Rules of Criminal Procedure, defendant now moves for a reduction of the sentence we imposed on September 6, 1979. We recognize the considerable effort and attention devoted by counsel to this application; he has made the most of the little that possibly can be extracted from the total record here involved.

### Defendant warned

When he first came on for sentence on August 18, 1976, the defendant was 40 years old, unmarried, with a very poor and erratic work record, a history of alcoholism and of severe anti-social activities. The probation officer assigned to the case had submitted an impressive report on the defendant, noting that: " . . . the subject was the product of an intact, closely knit small family unit where there were no serious problems other than occasional financial pressures. Both parents worked to afford their children most of the necessities in life and also saw to it that they received the proper religious and 'moral insight."

All these assets defendant had discarded and had adopted instead a dissolute life pattern pursuant to which defendant utterly failed to acknowledge social responsibil-

ities or moral considerations of any kind. He had accumulated a criminal record which we were prompted to denounce as "a disgrace." p. 7[1] Defense counsel on the instant application has himself pointed it out as: " . . . a criminal record of substantial magnitude." (p. 2 Affidavit of Harry C. Batchelder, Jr., verified December 31, 1979 and hereinafter cited as Affidavit). The probation report had revealed—and we stated it on the record—that he had two children he had abandoned, their whereabouts he claimed were unknown to him. For what it was worth, we emphasized "you have an obligation to the children . . . you owe them [concern]." (10, 11)[1]

The probation report also revealed that defendant had been gainfully employed for several months leading up to the date of sentence, in a store situated in Washington, D. C.; that his last arrest (a misdemeanor) had occurred in May, 1973; and that other instances of defendant's good deportment in recent years indicated a turn for the better. The defendant told the court at the sentence hearing of his intention to marry. A woman in the court room, identifying herself as a mother of two children aged 12 and 15, asked permission to speak. She told the court: "He is a changed person. He is in the store from the time the store opens which is ten o'clock in the morning, until nine o'clock at night . . . . I am engaged to him . . . I am willing to marry him." (8, 9)[1]

While we entertained some misgivings, we decided that the doing of justice to defendant and community alike strongly indicated an attempt at rehabilitation via two years probation (including the payment of $11,000 in back income taxes) with frequent probation progress reports to the Court. Throughout the sentencing, we spoke in the simplest of terms. In order to impress the vast majority of defendants, talking plainly, with colloquial expressions liberally interspersed, is an imperative.

We sternly and firmly warned him of the dire consequences that would follow an infraction of any of the conditions of proba-

1. References are to the official court transcript of August 18, 1976.

tion: " . . . if you . . . two-time me .. . . the yellowest thing . . . you are going [to jail] because that to me is an unforgivable thing to do . . . . If I get to hear from the probation officer that you are not living up to every condition of probation, if you violate any one of them [you will be sent to jail]." (10, 11)[1] Addressing his attorney (Mr. Herwitz) we emphasized: " . . . make him recognize that this is a judge you can't touch when it comes to two-timing him and make him hear it from you. MR. HERWITZ: I shall, your Honor, and I know just as you said, you have gone out of your way . . . I am sure it isn't without a certain amount of trepidation." (13, 14)[1]

Equally emphatically, we made known to the defendant that he would have our support if he behaved creditably: "If you make good, I will back you up . . . the Judge will be your support . . . ." His attorney spoke up, "Your Honor, I will take it upon myself . . . to implement this myself." (12, 15)[1] Finally, we pointed out that the defendant would be watched with care: "that's the reason I am getting those [probation] reports every 60 days . . . . I am giving you a chance and if you don't make good, I am going to hit you . . . good and solid." (17)[1]

We appreciate counsel's frankness on the instant motion in referring to that hearing in 1976: "The sentencing minutes indicate a Court that had recognized Poynter's efforts to come up the ladder and the belief, although with some reservation, that Poynter might be turned around. . . . a Court visibly disturbed by Poynter's prior record . . . [The Court] in no uncertain terms,. informed Poynter that if he failed, he could expect the worst. . . . warned that when giving a sentence of probation there are dangers given that a defendant must totally reorient his or her moral structure." (3, 4 of his affidavit)

### Poynter placed on probation

The key to intelligent sentencing is the court's knowledge of the amount and kind of disciplinary action, in light of the offender's moral standards and educability (capacity and rate of learning), that will be needed to restore him to his place in the community with sound attitudes toward it.

By placing the defendant on probation in 1976, we intended to afford defendant the chance to prove himself, to reach for, and climb up to higher ground. In the past, we have been elated repeatedly by the steps forward taken by legions of probationers given a chance of rehabilitation—most of them starting with disadvantages far exceeding those which confronted Poynter.

Frequently we have witnessed the moral rejuvenation of many of them, including the building of a value system, the gradual mastery of shame, false pride, fear, hatred; successful participation in socially rewarding activities; the balm of being free of surveillance. And once in a while, we have been privileged to see the process as a whole, from its incubation period through the stages of growth, of catastrophe, of therapy, of recovery, and of reintegration— with the scars, it must be said, plainly visible on the epidermis of both offender and society, but beginning to fade. Repeatedly we have witnessed a defendant on probation erect a platform of self-deceit and on it go down to defeat, and while clinging to it, like the Phoenix, ascend and conquer.[2]

A criminal court judge faces the spectre of a shattered career at a point where the wrong-doer is finally forced to examine himself and to acknowledge that his recipe for meeting life has failed. His predicament, brought on by arrest and subsequent court proceedings, produces severe shock, which may allow, for the first time, the admonitions of others to penetrate and help guide him onto a better track. Like physicians, judges must depend heavily on the recuperative powers of life itself, and trust to a reoriented will to stabilize character and subsequent behavior.

The determined offender against "the peace and dignity of the people" presents a challenge not to be evaded. The right to move safely, unmolested, through the city,

2. See, e. g., *United States v. Hicks*, 63 Cr. 977 (S.D.N.Y. March 11, 1964).

to be secure at work and at home, to be protected against frauds and schemers, is the supreme luxury of civilization. For that luxury, the community pays a huge price, and is intolerant of failure or laxity on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security and comfort. Many such offenders are crafty professionals whose aim is to bleed the community's resources for their own pleasures, at times using the instruments of the law itself to carry out and safeguard their operations and personal safety.

### Rehabilitation vis-a-vis probation

The law rightly takes great pains in order that persons should not be convicted of offenses they did not commit, or adjudged culpable in a degree beyond their deserts, or be punished in excess of what sound discretion assigns to a given quantum of offense.

One of the real problems presented to this Court constantly is to be able to recognize the innate potential of individual offenders for moral rehabilitation, and to ascertain the kind and extent of family and community support that is available to them in their efforts to reestablish themselves. There is often little difference in the offense and in the superficial attitudes of persons widely different in their human needs. Though rounded up by the same department store detective for the same offense, the little stenographer excited about giving up her job for marriage and a family, the erratic and superficially charming woman whose act is the culmination of a long and progressive series of impositions and thefts against family, relatives and friends, and the sheltered widow who until the death of an indulgent husband had never accepted the distinction between *meum et tuum*, represent far from identical situations as far as the sentencing judge is concerned.

The establishment of degree of legal culpability will not solve the problem of how these three persons are to be assisted to manage themselves and to establish a sound position in the community. Until the extent of character deterioration is known and the probable nature of the remediable measures needed to meet the condition determined, the Court cannot complete its mission with assurance.

The key to intelligent sentencing, therefore, is the Court's knowledge of the amount and kind of disciplinary action, in light of the offender's moral standards and educability, that will be needed to restore him to his place in the community with sound attitudes toward it.

We must recognize that fixed and arbitrary punishment for a legally established degree of offense is an unsatisfactory index of the moral potential of the individual; that the percentages of "cures" obtained with our present pharmacopoeia of corrective ingredients and dosages are profoundly discouraging; and that the hazards to courts, communities and offenders in treating offenses rather than persons are considerable.

We continue to ignore the warning at our peril. The better part of wisdom would be to mark well what appeared in "The Times" of London almost 150 years ago:

The greatest tyranny has the smallest beginnings. From precedents overlooked, from remonstrances despised, from grievances treated with ridicule, from powerless men oppressed with impunity, and overbearing men tolerated with complacence, springs the tyrannical usage which generations of wise and good men may hereafter perceive and lament and resist in vain. At present, common minds no more see a crushing tyranny in a trivial unfairness or a ludicrous indignity, than the eye uninformed by reason can discern the oak in the acorn, or the utter desolation of winter in the first autumnal fall. Hence the necessity of denouncing with unwearied and even troublesome perseverance a single act of oppression. Let it alone and it stands on record. The country has allowed it and when it is at last provoked to a late indignation it finds itself gagged with the record of its own ill-compulsion.

When a Judge is beset by fear that a sentence he is about to impose cannot in the nature of things be apposite, his professional sense is outraged. What he wants to know is what kind of a person with what needs he is sentencing; and into what kind of an institution or community, with what resources and what hazards for moral recovery, he is committing him. It is not impossible for a sentence to be a greater injustice than the criminal act: equivalent to putting a child with a common cold into a smallpox ward for treatment.

It makes a difference how people are arrested, charged, and bailed; what they do between arrest and trial; who helps or does not help them; what future is presented to them; what aids offered to realize it; what supports an attorney enlists for them, or medicine supplies; how the judge interprets to offenders the attitude of society toward their faults; the character of the discipline measured out, and the climate of its administration; most important of all, how the offender is assured that he is not cast out of society, but shown that he can elect to stay out. We hold that all these values inhere in the legal process and can be realized by their enlightened application to the individual before the Court.

As with all human disorders, whether of disease or of morals, the forces of repair and recovery reside in the stricken organism. Therapy assists nature—if the therapist knows enough about the processes to aid rather than to thwart them.

Probation must be regarded as a helping hand—a marvelous factor in rebirth; requiring a defendant not to repay, but to give something of himself; to live up to what the Judge and the probation officer expects of a probationer; or rather, "not live up to but live *to* what is expected" (as expressed by one successful probationer). We believe in probation, but we do not "hand it out." We prescribe it.

A science of moral rejuvenation can be built on the interplay between Court and offenders who have the will to meet the challenges. The price which the Court exacts of the probationer for the opportunity of probation is the renunciation of irresponsible relationships and the establishment of responsible relationships in their place. He must renounce to their faces, or by neglect, his one-time buddies and "friends" of both sexes, and take on stricter and more demanding discipline leading to a better way of life.

Some probationers are full of false knowledge about courts and probation. Hatred for authority (which is an aspect of their disease) and alternate periods of self pity and blame paralyze their wills. They are unable to visualize themselves restored and participating in the community.

A sound and helpful working relationship between probationer and probation officer is no inconsiderable achievement and is a credit to both, in light of the obstacles to achieving it. As one successful probationer put it, "The thing was to have just that little push to stay on the right road."

In the vast majority of cases where we have prescribed probation over the decades, this Court has had the opportunity to trace the progress of the probationers through the stages of recovery. The sight of this excursus into the region of self-healing has been encouraging to the degree of excitement. We are told quite often by the graduates of the probation process: "I feel strengthened . . . completely free . . . a feeling of understanding I've gained . . . hold my head high . . I am safe within myself."

Probation is a valid instrument of moral re-education capable of bringing substantial numbers of errant offenders to a degree of improved responsibility. The proper ending of any truly developmental process—school, hospital, probation, apprenticeship—is for the participant to have been released from some incubus, prepared for life's challenges, having acquired the assurance and capacity of being able to meet those challenges.

### Probation violated

Brought before us on August 16, 1979, the defendant admitted Specification 1 of the probation violations reading:

"You shall associate only with law abiding persons . . .," in that on 1/16/78, he associated with:

"(a) James Miller, a convicted felon and known procurer;

(b) Robert Al Smith, aka "Dennis Allen," a convicted felon and, at the time, a fugitive from the State of Texas, and;

(c) Lump Price, aka "Junior Price," a person having prior convictions for misdemeanor offenses."

The Government intimated on the record of August 16th (Transcript, p. 6) the existence of evidence of other such associations. There was another probation violation facing defendant:

" 'You shall get in touch immediately with your Probation Officer if arrested . . .' in that he did not immediately notify his Probation Officer that on 1/16/78 he was arrested by the New York City Police Department and charged with unauthorized use of a motor vehicle."

Defendant neither admitted nor denied it. However, from the impressive evidence presented at hearings and in the papers we were more than satisfied that defendant clearly violated this condition of probation also.

For almost three years after defendant was placed on probation by us (August 18, 1976), spotty probation checks by the Washington, D. C. office revealed nothing suspicious on the surface about his deportment. However, about the middle of 1979, during the course of an investigation by U.S. Probation Officer Veltre of this Court's probation department into one James Miller (hereinabove mentioned in the specification of probation violation by Poynter), it was learned that Poynter had been arrested in New York on January 16, 1978 and charged with Unauthorized Use of a Motor Vehicle. Further inquiry revealed that Poynter was not the only person in the automobile at the time of his arrest. In the afternoon of that day, four male persons were observed crossing West 22nd Street in Manhattan, coming from the direction of Miller's apartment building, by agents who had Miller under surveillance pursuant to an investigation of alleged crimes. They entered the stolen automobile. Special agents then converged on this automobile and placed all four in temporary detention status. The three persons with Miller were identified as Poynter, Dennis Allen and Lump Price (all named in the specification of probation violation hereinabove set out). It should be noted that Poynter had obtained permission from his Washington, D. C. probation officer Fenner to travel to New York City "to visit friends." Defendant never notified Fenner (or any probation officer) of his arrest.

Poynter admitted upon inquiry into the matter by Probation Officer Veltre, that upon his arrival in New York City on January 16, 1978 he telephoned Miller for a recommendation of a good New York barber. Miller instructed Poynter to meet him at his apartment so that he could drive him to a highly recommended barber uptown; Poynter then walked to Miller's address at 360 W. 22nd Street and met Miller, Price and Smith in the lobby. They proceeded to an automobile parked on 9th Avenue, and had hardly entered it when they were taken into custody.

Poynter's association with Miller since the sentence we imposed on August 18, 1976 appears to have been continuous. Probation Officer Veltre reported that the defendant "candidly states that he has spoken to Miller 'thousands of times' in recent years; that he had numerous telephone conversations with Miller since being placed on probation in August, 1976." A telephone company's toll records from mid-May to mid-July 1979 revealed eight calls of varying lengths from Poynter's home in Washington, D.C. to Miller's residence in Manhattan.

Official reports disclosed telephone calls made by Poynter to persons in Miller's organization. On May 27, 1979 he telephoned the late wife of Robert Al Smith. The Probation Officer noted that: "For the record, Smith shared in highest culpability status with James Miller in *U. S. v. Miller*, SS 78 Cr. 904. Like Miller, Smith was sentenced to serve 12 years in jail on June 29,

**610**

1979." Also on May 27, 1979 Poynter placed a telephone call to a Dallas, Texas number which, the probation officer informed us, "FBI agents advise has been called by others in Miller's organization in the past." Further, on January 11, 1979, pursuant to a search warrant, a book possessed by Miller's paramour, a convicted felon, was seized. In it was Poynter's telephone number. Defendant admitted to Probation Officer Veltre that he knew she was "Miller's girl friend." Poynter, according to the probation officer, "did not consider or perceive his numerous telephone calls to Miller to be in violation of Condition of Probation NO. 2, namely the association clause. The defendant had intimated to Veltre that because 'he is a man' it is unlikely that he will completely ignore long-term friends, especially if they are the ones to initiate the contact."

Without the approval of his Probation Officer, this defendant spent his vacation from August 11, 1978 to September 10, 1978 in Miami, Florida at an address connected with Miller in the past. Confronted with this information, Poynter told Mr. Veltre "it was a pure coincidence inasmuch as he picked that address out of the air."

Finally, this defendant's apparently complete disregard of the chance at rehabilitation we had extended him was evidenced by the fact that not one penny of his approximately $11,000 in back income taxes (one of the conditions of his probation) has been paid by him. It goes without saying that, while never expected, defendant's gratitude (a precious attribute so lamentably absent even in the best of us) for the chance to reform was never in evidence.

### Backsliding

Following his remand on August 16, 1979, Probation Officer Veltre had several interviews with this defendant. Officer Veltre states that: ". . . he has expressed much bitterness . . . that these proceedings are an unjust reward following a long and hard struggle toward rehabilitation . . . only to be confined for . . . associating with old friends."

With characteristic frankness, Poynter's counsel, on the instant application for a reduction of the two-year prison sentence we imposed in September, 1979, points to the decisive issue facing us for resolution. He contends: "Poynter's life has changed in that he was steadily employed and had some personal relationships which were in some measure supportive of his attempts to improve himself. . . . with a criminal record that virtually insured he could obtain no employment in the traditional business world . . . . there is not one shred of proof of covert criminality. That mere association is not a crime has often been charged by this Court and scarce requires repeating; that it can however be a violation of probation also scarce requires repeating. . . . Has Poynter slipped and not been able to live up to the exact letter of his probation? Yes. . . . did Poynter slump right back and pull off a 'raw deal' as this Court feared? Poynter admitted he had called Miller several times and offered him assistance at the time of Miller's recent criminal activity. Keeping in mind this Court's awareness of the difficulties of totally renouncing a life style, is this incident, coupled with the telephone calls sufficient to wipe out three years of effort? . . . The descent to criminality in the face of adversity which this Court envisioned at the time of the original sentence [August 18, 1976] has not come to pass. If there was more to this than meets the eye . . . [the prosecutor's office] would be relentless in its pursuit of the commission of additional [crimes] . . . this Court's initial sentencing colloquy was more than merited." (Counsel's affidavit, pp. 4–7)

Defense counsel disagrees with the Probation Officer's observation that: "If at all serious about rehabilitation, he would have divorced himself entirely from past criminal associates regardless of the possibility of friendship loss." It should be observed that counsel does not disagree with what we regard as an imperative for successful rehabilitation: "In *Rivera*,[3] the Court pointed

**3.** *United States v. Rivera*, 434 F.Supp. 486 (S.D. N.Y.1977). On kindred issues with which he

deals in his moving papers, counsel cites: *United States v. Unterman*, 422 F.Supp. 228 (S.D.N.

out that the desire to change is mostly in the individual's own nature and the desire to repair the damage must come from self motivation." (p. 4 of his affidavit)

For purposes of comparison, counsel calls our attention to the behavior pattern of certain defendants in other criminal cases. We know nothing of the total factors which required consideration in order to arrive at a proper disposition in each of those cases. There are bound to be seemingly endless variables. The tests which we have applied in the instant case, what might they tote up to and reveal in the other cases? Just one side remark: No mention of a prior criminal record is made as to any of the defendants in the matters raised, whereas Poynter, at the time he was accorded the benefits of probation had "a criminal record of substantial magnitude" (as counsel put it). Certainly, we have no occasion to speculate about cases that are not before us.

### Poynter double crossed us

If defendant had lost his employment by reason of his indifference to his duties, or if he had failed to pay his back income taxes or committed a probation violation of similar nature, we might have called him to account, given him a sharp warning, possibly ordered a short period of incarceration and then restored him to probation. However, the violation we are compelled to face up to here is extreme—tantamount to a deliberate avoidance of the most imperative requisite within the four corners of the probation decree.

The facts and circumstances surrounding Poynter's violation of the terms of his probation, together with the normal, natural and compelling inferences to be drawn therefrom, compel us to conclude by proof satisfactory that his renewed association with Miller and his cohorts went far beyond

a renewal of acquaintances; that Poynter was up to no good; ready, able and willing, if given the chance, to participate in Miller's nefarious practices. It must be borne in mind that this defendant was arrested with Miller and his associates Robert Al Smith and Lump Price on January 16, 1978, less than a year and a half after being given a chance on probation, and that he kept in frequent contact with them while putting on a clean front for inspection by probation officers. Our predisposition formed in judging countless such situations, coupled with our life experiences (more reliable even than logic) force us to this conclusion. Further, we were outraged at Poynter's deliberate disdain of the boon we accorded him by placing him on probation in August, 1976, in light of the seriousness of the effort of other probationers to "make good" when given a similar chance.

> Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine. . . .
>
> We are born with predispositions; and the process of education, formal and informal, creates attitudes in all men which affect them in judging situations, attitudes which precede reasoning in particular instances and which, therefore, by definition, are pre-judices. . . .
>
> Interests, points of view, preferences, are the essence of living. Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference. . . .
>
> The standard of dispassionateness obviously does not require the judge to rid himself of the unconscious influence of such social attitudes.

*In re Linahan*, 138 F.2d 650 (2d Cir. 1943).[4]

Y.1976); *United States v. Rannazzisi*, 434 F.Supp. 619 (S.D.N.Y.1977); *United States v. Soldano*, 437 F.Supp. 85 (S.D.N.Y.1977); *United States v. Cachoian*, 440 F.Supp. 39 (S.D.N.Y. 1977).

4. Further: "If, however, 'bias' and 'partiality' be defined to mean the total absence of precon-

ceptions in the mind of the judge, then no one has ever had a fair trial and no one ever will. . . . An 'open mind,' in the sense of a mind containing no preconceptions whatever, would be a mind incapable of learning anything, would be that of an utterly emotionless human being, corresponding roughly to the psychiatrist's descriptions of the feeble-minded. . . .

We find further such comment in *Skidmore v. Baltimore and O. R. Co.*, 167 F.2d 54 (2nd Cir. 1948):

> (Lord Bramwell observed, "One third of a judge is a common law juror if you get beneath his ermine"; and Mr. Justice Riddell added that "the other two thirds may not be far different.")

In consequence of the above considerations, we revoked probation and sentenced Poynter to a term of two years in jail on September 6, 1979. We "put it on the line" to him: "Poynter, when I took a chance on you at the time I gave you probation, I said very distinctly that I had very severe doubts that I was doing the right thing. At that particular time, after an ugly criminal record, you were doing quite well, and it occurred to me . . . that job you had might be the beginning of rehabilitation . . . in the course of my judicial life I have taken chances on . . . guys from the gutter and I have done pretty well with a good number of them, surprisingly well. . . . when they begin to show . . . willingness to come clean and do a good . . . legitimate job, that's the beginning, in my eyes, of possibly a new learning, a new acquisition of how to behave, and maybe you ought to be given a chance to prove it. I could have sent you to jail right there and then . . . and I told you so." (Official Court transcript, Sept. 6, 1979, at 13–14)

We recalled to him the many points we stressed when he was placed on probation, and concluded: "You two-timed me backwards and forwards. You did not live up to what you promised you would do . . . anybody who two-times a judge who took a chance on you the way I did deserves the maximum." (p. 17)

Today, six months after we ordered Poynter to jail for two years, it would be unthinkable to change that determination one whit. In dealing with the criminal mentality, the Judge does his best for the defendant—but also must keep to the forefront the welfare of the community. The considerations which prompted this court to "take a chance" on Poynter are no longer present. By his own acts he has betrayed this court's confidence in him and revealed himself unable to reform by the strength of his own will. Leniency having failed, a stricter discipline is clearly required.

Accordingly, the application to reduce sentence is denied in all respects.

SO ORDERED.

---

[the] 'court room is a place of surging emotions * * *; the parties are keyed up to the contest, often in open defiance; and the topics at issue are often calculated to stir up the sympathy, prejudice, or ridicule of the tribunal'. . . .

Impartiality is not gullibility. Disinterestedness does not mean child-like innocence. If the judge did not form judgments of the actors in those court-house dramas called trials, he could never render decisions."