**UNITED STATES of America, Plaintiff-Respondent,**

v.

**George OCHS, Defendant-Movant.**

**No. 77 Cr. 775 (IBC).**

United States District Court, S. D. New York.

May 7, 1980.

William M. Tendy, U. S. Atty., S. D. N. Y., New York City, for United States; Peter D. Sudler, Asst. U. S. Atty., New York City, of counsel.

Steven H. Gifis, Princeton, N. J., for defendant-movant; Alan Dexter Bowman, Princeton, N. J., of counsel.

## OPINION

IRVING BEN COOPER, District Judge.

Having served two (2) years of a sentence of twenty-three years which we imposed on April 14, 1978, defendant presents us with his application for a reduction of sentence, Fed.R.Crim.P. 35; or, in the alternative, for establishment of a minimum term at the expiration of which he will be eligible for parole, 18 U.S.C.A. § 4205(b)(1); or a maximum term after which he may be released on parole, 18 U.S.C.A. § 4205(b)(2).

The defendant was indicted on October 26, 1977 for extortion, obstruction of justice and income tax offenses. The trial by jury commenced January 16, 1978 and concluded with a verdict of guilty on all seven counts on February 6, 1978 (maximum jail term 40 years). He was remanded for sentence and has been confined ever since.

Besides the jury verdict that the defendant was guilty of extortion, income tax evasion and obstruction of justice, we should point out that the evidence adduced at trial supported the Government's insistence that the defendant made threats of murder to collect a usurious loan; that he engaged in substantial tampering with both the grand jury and trial processes; that his income tax returns were filled with false assertions of a material nature which substantially reduced the income tax due, and that his illegal sources of income included loansharking and prostitution as well as extortion.

Defendant's conviction was affirmed by our Circuit Court of Appeals on May 13, 1979 (2 Cir., 595 F.2d 1247); petition for certiorari was denied by the Supreme Court of the United States on November 13, 1979 (444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328).

### Defendant's claim of rehabilitation and contrition

In support of his application, the defendant emphasizes his "exemplary" record of

deportment during the first two years of the sentence we imposed including his observance of all penitentiary rules and regulations and his conscientious fulfillment of all work assignments for which he has received high commendation from prison personnel. In support of this, he calls our attention to memoranda filed by responsible members of the staff connected with the penitentiary describing the defendant as: "cooperative and polite with a pleasant and cheerful attitude and personality"; "dependable"; "His duties [as hospital orderly] are the cleanliness of various offices and sanitation in general. . . . I found him most cooperative with both inmates and staff . . . a good positive attitude. . . . has voluntarily performed other work"; "He has made several suggestions which improved the maintenance of this hospital." Drawing on several such reports, the progress report of defendant's case manager dated November 1979 includes the view that the defendant is: "an excellent worker, who utilizes initiative in his ability to perform his duties under minimum supervision." The progress report further notes: "Tentative Release 06–05–93" and concludes: "At this juncture, the A–West Unit Team respectfully requests that Mr. Ochs be granted parole at his parole eligibility date, with his release to be facilitated through a community treatment facility, upon his qualification. . . ."

In his hand-written letter to us received March 21, 1980 (made a part of the papers on this application), defendant proclaims: "I now ask to be judged by American standards of fairness." He complains that each and every one of the sentences he ever received were harsh and severe; that some of his actions in the early part of his criminal career are not regarded as criminal today; he blames himself for bringing grief to his family stating that: "because of my stupid silly acts. . . . I well realize the error of my ways and the manner that I have wasted my life. . . . I broke the laws of society for which no one is as sorry as I am."

Based solely on what we have so far generally recited, defendant's counsel urges us to consider: "[M]ovan[t] [has made] progress during his already lengthy period of incarceration." Memorandum of Law On Behalf of Defendant-Movant In Support of Motion for Modification of Sentence, p. 1 [hereinafter Movant's Memorandum]. "Movant failed in the past because he was unable to accurately assess the nature and quality of his conduct with a meaningful understanding of the tenets of good and evil." *Id.* at 2. "[Defendant] made a positive adjustment in prison. . . ." *Id.* at 3. "[Defendant] has demonstrated a commitment to self-improvement and adjustment." *Id.* at 5. "[H]is positive adjustment over a period of two years in prison indicates that he poses no present danger to society and . . . he need not be so severely punished to be deterred from future anti-social conduct." *Id.* at 7. "Movant's spirit should not be buried beneath a sentence which . . . [does not] encompass the ability of the man to grow and change." *Id.* at 7–8. "[Defendant has a] real desire to assume an honest and earnest position in society upon his release." *Id.* at 8. "Movant has demonstrated a strong and determined effort to rehabilitate himself. . . . [Defendant] has essentially reformed himself. . . ." *Id.* at 13. "[Defendant's] celerious rehabilitation appeared to be in the realm of the miraculous." *Id.* at 16. "[M]ovant's progress has exceeded all of the Court's expectations." *Id.* at 17. "[H]e has made persuasive progress. . . ." *Id.* at 18. "[Defendant] has effected a complete reversal of the inertia which grasp [sic] him at age 16 and carried him through 32 years of lost life. . . . It is . . . necessary to reassess [him] . . . in light of his new attributes." *Id.* at 20.

*At sentence*

At sentence we were confronted with a criminal behavior pattern we regarded shocking and repugnant to an offensive degree. We spoke plainly to the defendant in open court, employing language he would understand:

I told you . . . that I have been a judge for almost forty years. . . . I have seen the agony, the distress, the horror, the filth, as well as the glory of human behavior.[1]

. . . . .

It's easy for someone to say, "Throw the book at him," or "He's no damned good; let him rot," "Boil him in oil." I hear that all the time, even long before a person has actually been found guilty.

So I must ask myself, on the state of this record, just as the surgeon must ask himself on the basis of . . . x-rays and . . . tests, what do we do? Is a 20-inch incision imperative or can we do it with less? What is best for this patient? And so we ask ourselves what is best not only for this defendant but for the community?

I would be less than frank, Ochs, if I [did not tell] you that you have been your own worst enemy; that almost from the time you were a boy you were saturated with a sort of hatred for law and order. Whether at that time you could have been disengaged, so to speak, from harboring thoughts that led to your own downfall I don't know, but look at the record of your deportment, the periods of incarceration, and yet, as though it were a heavy drug, you have been unable to throw it off. You go forward with the same antisocial attitude that you had from the very beginning as a boy.

You are not a drug-user or a drug-seller, and yet when I look at those unfortunates who are the victims of it, I find that they too have an enormous burden that they can't shake. You have the equivalent. Every molecule of you, so to speak, is against authority. You have never been won over and [while] I can't say that it's too late, . . . [there is little chance] of your straightening yourself out and seeing what it means to be a person of self-respect, an American citizen who can walk straight and unafraid. I think the chances of getting you to subscribe to that are very, very meager. It's unfortunate, but who is to root it out of you?

I deplore the predicament in which you find yourself, but like the surgeon, he too deplores the pain, the aches, the almost helplessness of the patient, and yet he must operate.

There is nothing personal about this. It's the same judge who was on the bench forty years ago. . . . "I want to know who the defendant is. I want more than what he did."

. . . . .

Although it's been my lot to be a judge all these years, . . . this case has given me as much concern as any case ever did. This business of growing hard and callous, it all depends on the human being involved. . . .

What is justice for this defendant and for the community?

I won't repeat, Ochs, the many things that have been brought out. You read the probation report yourself, [as did] your lawyer. . . .

Your family is in court and I can't bring myself to go into details. I don't want to give you a lecture. I don't think the lecture would do you any good, and I don't think that the judge means anything to you except insofar as what he is going to, to use the vernacular, "hand out."

I don't think that I have that capacity to influence you, and so, therefore, I don't see any purpose by a recitation of what you have done with your life.

In my book, you have been in moral bankruptcy from the time you were a boy. . . . [H]ow you . . . failed to see that you weren't getting anywhere is beyond me, because you are not a fool. You have a good head. You just didn't put it to use in the right direction.

When you point out to me, as your lawyer has, certain acts of kindness, I don't think I have ever dealt with a human being in all the thousands of cases in which I have participated who was so rotten that there wasn't anything redeemable about him.

---

1. Transcript of March 14, 1978, pp. 30–31.

You are not totally bad. You are bad. And that was of your own choice. . . . The charges are very serious; they can't be brushed aside.

If a judge can't let law prevail, he has no right to be a judge. If he hasn't got what it takes to stand up and say "This I believe in. This I do. And I go this way and not that way," he shouldn't be a judge.[2]

. . . . .

I am not here to determine whether or not you slashed somebody else unless there has been proof that is quite convincing to me. If I thought that that was your method of behavior, I'd give you every day that the twenty years' maximum prescribes, and don't fool yourself about that. If that was your way of life, if that was your hallmark, you'd go away for twenty years on that one.

. . . . .

[T]he court has it within the Court's power to send you away for forty years and make no remarks at all, there is nothing in the law that says I have to do anything more than rattle off a time period. I choose to do it so that everybody can know what goes through the judicial noggin in order to arrive at a sentence that has to be meted out, not as a matter of choice, but as a matter of law.

[A]fter sober reflection—and I have had a long time in this case to figure it out and search for what is due and proper—the sentence of the Court is [a total of 23 years]

. . . . .

. . . . .

MR. BLOSSNER [defense attorney]: I would ask the court to run those particular sentences concurrently—

THE COURT: Mr. Blossner, did you hear the Court speak?

MR. BLOSSNER: I did, your Honor.

THE COURT: Did you think I was just rattling something off, or did you get the impression that the judge meant every word that he uttered?

MR. BLOSSNER: Not only did I realize that the Court meant every word, but I realize that the Court has given it an enormous amount of consideration.

THE COURT: Therefore, you see, your request is out of order. I could have done that without your telling me; it's obvious. I chose not to after reflection.

Don't add on to it. Enough has been said.

There is the Court's judgment after serious reflection . . . . .

MR. BLOSSNER: I would ask that the Court . . . sentence him under the Section B(2) which would enable parole to parole him at such a time as they see fit.

THE COURT: Application denied, with permission to renew it in appropriate time.[3]

We get the impression that defendant's present counsel found no fault with the sentence when we imposed it on April 14, 1978, since he states that: "At sentencing, this Court issued a thorough probative statement as to its concerns and objectives in imposing the harsh sentence. . . . The Court destroyed all illusions and left movant to confront the reality of his past and the bleakness of his future unless a transformation of his consciousness occurred. . . . This Court, in its stinging articulation of movant's deeds, set in motion the effectuation of a new awareness. . . . [T]his Court carefully considered all relevant factors and fashioned a sentence consistent with its evaluation. . . . The Court sentenced an offender who it felt was in need of punishment for a lifetime of ill deeds." Movant's Memorandum at 1–7, 20.

*Pertinent material absent*

The moving papers fail to present a full disclosure of defendant's behavioral pattern up to the date of our imposition of sentence. During the lengthy appellate proceedings which ensued after the trial, the defendant raised, in our Court of Appeals and in the

---

**2.** *Id.* at 32–36.

**3.** *Id.* at 37–41.

Supreme Court of the United States, the issue of the sentence he received. In rejecting his claim that the sentence we imposed was illegal, arbitrary and capricious, Judge Friendly wrote for the Second Circuit:

We are not disposed to use this case to test the limits of our power with respect to sentences that are within legal limits and are not shown to have been based upon materially inaccurate information. Judge Cooper was dealing not with a man who had simply yielded to the temptation to cheat the Government of income taxes by claiming false exemptions but with an individual whose whole life from the age of 16 to his then age of 48 had shown a contemptuous disregard for law. After serving jail sentences and being released on parole, he repeatedly violated parole by committing new crimes. On the undisputed record disclosed in the pre-sentence report, <u>the judge could reasonably have given Ochs an even higher total sentence than he did</u>. Particularly in light of our disposition of the suppression claim, we are not concerned with how the sentence was structured. (emphasis added)

*United States v. Ochs*, 595 F.2d 1247, 1262 (2d Cir.), *cert. denied*, 444 U.S. 955, 100 S.Ct. 435, 62 L.Ed.2d 328 (1979).

The underscored words, *supra*, do not appear, even by reference, in the moving papers. Because other highly pertinent material has been omitted on this application—vital to defendant and community alike—relating to the possibility of "rehabilitation," "redemption" and early release of this defendant, we are constrained to fill in. To say the least, a full disclosure was in order, for we must know the *whole* person we are told has "reformed."

▮ Indispensable is a thorough search for all details having even the slightest bearing on a defendant's character, past and present. Often such an inquiry proves rewarding, for it supplies insights into strengths and weaknesses not theretofore revealed and furnishes enlightenment as to how best to write the sentence prescription. This approach is imperative and has long

been encouraged and approved. In the exercise of his discretion, the judge may

consider information about the convicted person's past life, health, habits, conduct, and mental and moral propensities. . . . Highly relevant—if not essential—to his selection of an appropriate sentence is the *possession of the fullest information possible* concerning the defendant's life and characteristics. . . . [The] modern philosophy of penology . . . [emphasizes] that the punishment should fit the offender and not merely the crime.

*Williams v. New York*, 337 U.S. 241, 245–47, 69 S.Ct. 1079, 1082, 1083, 93 L.Ed. 1337 (1949) (emphasis supplied). *See also* 21 U.S.C. § 850.

### The indictment

The jury found this defendant guilty as charged in the indictment, the essential wording of which follows:

*COUNT ONE*

The Grand Jury charges:

1. From in or about early 1973 up to and including the date of filing of this Indictment, [October 26, 1977] . . . the defendant, owned and operated several New York City massage parlors, including the Studio I massage parlor, located at 100 West 43rd Street, New York, New York, which he operated as a house of prostitution.

2. From in or about April, 1975 up to and including September, 1975, . . . Debbie McElroy was employed as a prostitute at several New York City massage parlors, including the Studio I massage parlor . . . . .

3. On or about April 4, 1975, Debbie McElroy borrowed $1,500.00 from GEORGE OCHS, . . . and agreed to repay him the $1,500.00 plus $400 interest within nineteen weeks.

4. From on or about April 4, 1975 up to and including September 30, 1975, . . . the defendant, unlawfully, wilfully and knowingly did use extortionate means, to wit, the use and the express and implicit

threat of use of violence and other criminal means to cause harm to the person, reputation and property of Debbie McElroy, in order to collect and attempt to collect from the said Debbie McElroy an extension of credit and to punish her for the non-repayment thereof.

.    .    .    .    .

## COUNT TWO

The Grand Jury further charges:

5. From on or about April 1, 1976 up to and including the date of filing of this Indictment, a duly empaneled United States Grand Jury was sitting in the Southern District of New York hearing evidence of possible violations of Federal criminal law in order to determine whether to charge certain individuals, including . . . the defendant, with having violated the Federal criminal law.

6. [I]n order to determine during the period of January 1, 1972 to October, 1977:

(a) Whether . . . the defendant, collected extensions of credit by extortion and threats (commonly referred to as "loansharking");

(b) Whether GEORGE OCHS, . . . the defendant, threatened or inflicted bodily injury on Debbie McElroy for failure to repay a loan;

(c) Whether . . . the defendant, loaned money to individuals at usurious rates of interest and whether he threatened or inflicted bodily harm on said individuals for their failure to repay loans.

(d) Whether . . . the defendant, through a pattern of racketeering activity, including extortion and extortionate credit transactions, and through the collection of unlawful debts, acquired or maintained, any interest in any New York City massage parlors; and

(e) Whether . . . the defendant, evaded his federal income taxes and filed false income tax returns during the years 1971 through 1975 by failing to report the income he received as proceeds from extortion, loansharking and prostitution and by claiming false personal exemptions.

7. From on or about April 1, 1976 up to and including the date of filing of this Indictment, . . . the defendant, unlawfully, wilfully, knowingly, and corruptly did influence, obstruct and impede and endeavor to influence, obstruct and impede the due administration of justice by instructing persons who were subpoenaed to appear before the Grand Jury as witnesses to give false, evasive and misleading testimony and to have said persons assert their Fifth Amendment privilege against self-incrimination before the said Grand Jury.[4]

.    .    .    .    .

## COUNTS THREE THROUGH FIVE

The Grand Jury further charges:

8. On or about the 15th day of April following each of the years enumerated below in Counts Three through Five, [1971, 1972 and 1973] . . . the defendant, . . . who between January 1, 1970 and April 15, 1974 was not married, unlawfully, wilfully and knowingly did make and subscribe and cause to be made and subscribed, United States Joint Income Tax Returns, Form 1040, verified by written declarations that they were made under penalties of perjury and filed with the United States Department of Treasury, Internal Revenue Service, which . . . the defendant, did not believe to be true and correct as to every material matter in that . . . the defendant, falsely claimed therein that he was married and had children as set forth below in Counts Three through Five under the caption "false exemptions claimed," whereas, in truth and in fact, as . . . the defendant, then and there well knew, he was not married, did not have any children and was therefore not entitled to claim any income tax exemptions for a wife and children.

.    .    .    .    .

---

4. At sentence, Ochs said: "Every witness that I spoke to who I knew was going to the Grand Jury, I told them all not to run away and not to get themselves in trouble. I never intended to break any of the law by telling anyone that he had constitutional rights." Transcript of March 14, 1978 at 27.

*COUNT SIX*

The Grand Jury further charges:

9. That during the calendar year 1974, . . . the defendant, . . . had and received a gross income of approximately $27,185.00; that by reason of such income he was, following December 31, 1974 and on or before April 15, 1975, required by law to make an income tax return . . . stating specifically the items of his gross income and any deductions and credits to which he was entitled; that well knowing all of the foregoing facts, . . . the defendant, unlawfully, wilfully and knowingly did fail to make an income tax return . . . . .

. . . . .

*COUNT SEVEN*

The Grand Jury further charges:

10. That during the calendar year 1974, . . . the defendant, . . . had and received a taxable income of approximately $23,685.00; that upon said taxable income he owed . . . income tax of approximately $5,939.00; . . . that well knowing the foregoing facts, . . . the defendant, on or before April 15, 1975, . . . did unlawfully, wilfully and knowingly attempt to evade and defeat the income tax due and owing by him . . . by failing to make an income tax return . . . by failing to pay . . . any income tax and by concealing and attempting to conceal sources of income derived from extortion, loansharking and prostitution as set forth in paragraphs 1 through 6 of this Indictment . . . . .

*The presentence report*

Defendant's counsel had full opportunity to examine the report before we imposed sentence. Its substance was commented upon during sentence. The highlights of that report are completely absent from the moving papers. In a thorough and carefully prepared report by United States Probation Officer Weber, we learned that defendant was born April 20, 1930; at time of sentence he was 5 feet nine and one-half inches; weight 275; single, no children; that he received a high school equivalency degree in 1952 and a New York State Regents diploma while in custody. Emphasis is placed on defendant's illegal activities during the greater part of his adult life; that he "resisted obtaining regular lawful employment" and concentrated over many years on the operation of massage (prostitution) parlors and loansharking. Upon his arrest by New York City police, defendant's personal records were seized and examined; the disclosures unmistakably showed that for many years he charged interest based on 25 percent of the amount loaned and collected additional "vig" payments of 25 percent of each weekly payment if a payment was missed. Expert testimony introduced at trial estimated that Ochs had $100,000 in principal "on the street" (loaned out).

The probation report continues: "Ochs further sought to conceal his income through the establishment of phony bank accounts through which he accepted payments in names other than his own. . . . [H]e made loans to various prostitutes who worked at Studio I and other massage parlors and also made larger loans to [two men] who supplied the security guards for Studio I. One of the loans Ochs made was for $1,500 to Debbie McElroy on April 4, 1975 at a time when she was employed as a prostitute. [It] was to be repaid in 19 weekly payments of $100 each (thus $400 in interest); [defendant] continued to derive profits from his prostitution and loansharking even after he was remanded on this case." In the course of his interview with Probation Officer Weber, Ochs admitted that he derived income from Studio I and from loans made to various individuals, stating that "his initial motivation for lending money was largely philanthropic."

The presentence report further reveals that "The defendant has a very extensive criminal history marked by arrests for charges relating to automobile theft, promoting prostitution and burglaries. A 1956 presentence report prepared for Nassau County Court reads, in part . . . Ochs 'states that he has lived off the proceeds of

prostitution, he has stolen cars for a living, and that he might be guilty of many offenses, but he is not a burglar.' "

Still another fact in the presentence report caught our attention. The records of the New York State Department of Correctional Services include a report by a psychiatrist in June, 1968 after his examination of defendant while a prison inmate. His diagnosis found defendant without psychosis but suffering from a "psychopathetic personality with asocial and amoral trends." Another psychiatrist in July, 1969 offered the diagnosis that Ochs suffered from a personality disorder, an "antisocial personality" of moderate severity.

From his interviews with the defendant and the research he conducted, Probation Officer Weber concluded that "Ochs is a persistent felony offender . . . that from at least 1955 onwards Ochs has been involved with violent behavior, either directly or implicitly. *He displays no remorse whatsoever for his recent or past actions and has, to our knowledge, never expressed a desire to conform to the rules of society."* (emphasis supplied)

### The defendant's criminal record

From 1944–1977, Ochs was arrested thirteen (13) times on criminal charges which included rape, grand larceny, compulsory prostitution, burglary, armed robbery, criminal possession of stolen property, bribery, violation of parole, extortion by threat, tampering with witnesses called to testify, and income tax evasion. The dispositions varied, including dismissal of certain charges, suspended sentence, fines or probation; in sum the result was imprisonment for the greater part of this defendant's adult life.

Out of a vast array of detail relating to his arrests and convictions, we select a few episodes we regard as significant. On February 17, 1950 Ochs received a sentence of 3½ to 10 years in Bronx County Court. The charge was grand larceny. During the period July 22, 1949 to October 27, 1949, the defendant stole seven new Oldsmobile automobiles, two new Buicks and one new Pontiac, one of which he kept for himself and the others of which he turned over to William Uhl and Frank Martus (also prosecuted) who then sold them. The three men divided the proceeds equally among themselves. Records of the New York State Department of Correctional Services indicate that during the period February 1950 to February 1953, Ochs made a good institutional adjustment. While under subsequent parole supervision, the defendant resided with his parents and had a poor employment record. He was apprehended by the police on August 3, 1955 and subsequently absconded from supervision.

On August 13, 1955 Ochs was apprehended again by New York City police on charges of Compulsory Prostitution and Rape and for Grand Larceny of an Automobile (stolen on April 14, 1955), but he escaped from custody prior to the completion of the arrest procedure. During the ensuing 11½ months while he was a fugitive, he reportedly staged a simulated suicide, leaving a note indicating that he had jumped off the Triboro Bridge.

Subsequent to his apprehension on July 20, 1956, Ochs entered pleas of guilty to rape second degree and grand larceny first degree; he was sentenced to prison on November 21, 1956 where he remained until paroled on October 26, 1965; he was declared a delinquent parolee on April 3, 1966. When arrested on July 20, 1956, Ochs was allegedly in possession of a 1955 Chrysler automobile reported stolen on February 25, 1956. When apprehended on August 13, 1955, he was in possession of a Cadillac automobile valued at $3,000, stolen that month.

As already mentioned, Ochs was paroled on October 26, 1965. On June 24, 1966 he was arrested by federal authorities on charges that he had participated in the armed robbery of a Staten Island, New York post office (these charges were subsequently dismissed). Among the ten specifications in his violation of parole charges was the charge that on June 24, 1966 when apprehended, Ochs had in his possession a stiletto, a length of rubber hose, a

blackjack, burglar tools, spurious police identification and a forged New York State driver's license. In addition, he was operating a vehicle without a valid license and the automobile he was operating, a 1960 Cadillac, was registered to [Joseph Keppel] a friend whom he knew to have a criminal record (they were arrested together during 1944 for Juvenile Delinquency—Grand Larceny Auto).

In a case pending at the time of sentence, defendant was charged with bribery, etc. It is alleged that the defendant, acting in concert with two others, paid various amounts of money to the New York City Police Department officers who arrested him on September 5, 1975 in an attempt to have those officers falsely testify in regard to that arrest, and, also, to have them obtain copies for the defendant of his loan-sharking records. A portion of the evidence in that case was adduced upon the trial before us.

### Rehabilitation

We have always believed in rehabilitation invariably accompanied by real contrition, as a power for good; we have encouraged it at every opportunity; we have witnessed the enormous benefits it can render offender and community alike; we do not "hand it out"—rather, in the proper case, we prescribe it. We have our remedy if our extended hand is rejected or our faith in the capacity and potential strength of the offender proves misguided. *See United States v. Poynter*, 489 F.Supp. 604, (S.D. N.Y. 1980).

We deal here with a person whose whole being during the greater part so far of his adult life has been saturated with criminal intent translated into almost uninterrupted lawless activity. Without a doubt, he has been a determined offender against community well-being. Apprehension concerning his motives and movements is bound to ensue. The right to move safely, unmolested, to be secure at work and home, to be protected against frauds and schemers, is paramount. For it, the community pays a huge price, and is intolerant of failure or laxity on the part of its agents and instruments. It cannot be patient with or concerned about the welfare of offenders while they threaten its security and comfort. Many such offenders are crafty professionals whose aim is to bleed the community's resources for their own pleasures, at times using the instruments of the law itself to carry out and safeguard their operations and personal safety.

It is the constant and indispensable lot of the Court to search thoroughly for solid evidence pointing to the innate potential of offenders for moral rehabilitation and to determine just what it will require for them to establish and maintain themselves along lines heretofore foreign to them and inimical to their way of life.

The Court must acquire knowledge and therefrom make a judgment as to the amount and kind of disciplinary action, in light of the offender's moral standards and educability (capacity and rate of learning), that will be needed to return him to an upright position in the community with sound attitudes towards it. What are the resources and what are the hazards for moral recovery? As with all human disorders, whether of disease or of morals, the forces of repair and recovery reside in the stricken organism. Like physicians, judges must make allowance for the recuperative powers of life itself, and to a degree, trust to a reoriented will to stabilize character and subsequent behavior.

In our judicial experience over four decades, we have seen examples (often quite stirring) of just that—a defendant going from the depths of iniquity to the heights of uninterrupted living within the law. Repeatedly we have witnessed an offender erect a platform of self-deceit and on it go down to defeat, and while clinging to it, like the Phoenix, ascend and conquer. Often we have traced the progress of offenders through the stages of recovery. The sight of this excursus into the region of self-healing has been encouraging—on occasion to the degree of excitement.

*Defendant's present moral standards*

As of today, what really are Ochs' moral standards and what is his educability (capacity and rate of learning)? His hatred of authority (an aspect of his disease), overwhelmingly established by a fair reading of his history, his alternate periods of self-pity and blame, are they all behind him now? Is he still morally immature? Is he prepared for life's challenges and has he the unwavering will to meet them because he has acquired the imperative capacity to do so? In a word, how deep-seated and impervious to attack is his moral conviction for clean living founded on good morals? What assurance have we that he will not slip back—reinfect himself and infect still others? Is he unflagging in his determination to renounce to their face, and by neglect, his one-time buddies and "friends" of both sexes, and take on stricter and more demanding disciplines?

How do we go about certifying that the patient once dangerously ill is now on the way to complete recovery? The resolution of these pertinent questions, imperative if justice is to be done here to defendant and community alike, can hardly be undertaken on the woefully thin evidence—qualitatively and quantitatively—presented to us on this application.

We have searched in vain for meaningful evidence of true contrition by Ochs (we only have his word for it). Nor is there even a murmur of a plea for forgiveness. Often we have witnessed offenders thrash about as they comment on the cause and the situation wherein their crimes had been incubated and matured; they expose and dissect their moral nature at the time of arrest; they demonstrate the perception and acknowledgement of fault, the will to make restitution, their acceptance of the community's moral sanctions. Not so with Ochs.

*Defendant's industry and pleasantness*

■ We are told that Ochs has been very industrious throughout the past two years of his incarceration. This is not a new strength he has acquired, for that characteristic has always been true of him—in and out of his illegal pursuits (the presentence report establishes this convincingly). In our judicial time, over and over again we have seen "model" or "exemplary" prisoners upon early release either "make good" in life or succumb sooner or later to the magnetism of the urge to pick up where they left off. The fact is that defendant's prison behavior a great many years ago was given a high rating. In a word, on an application such as the one before us, commendable prison deportment is only some evidence on the issue to be resolved, neither to be disregarded nor overestimated.

As to the pleasantness which has been observed throughout his penitentiary stay so far, we know (from the probation officer's report and letters received from family and friends) that there is a pleasant side to Ochs which he has invariably shown to family and friends for whom he professes deep affection [5]—never, of course, giving them the slightest inkling of the extent of his departure from good moral standards.

We have long witnessed over the decades large numbers of persons (law offenders and law abiding) who, totally unsympathetic with the law's restraints, have resisted, by enormous effort, the nagging temptation to disobey its strictures, solely to avoid the hurt that could very well come to dear family and devoted friends. It must be said, we regret, that at no time has Ochs been willing to go that far. In this respect alone, he has much for which to atone.

*Aid to law enforcement officials*

Completely satisfied that during the past two years the defendant has maintained a very good work record and pleasant manner at the penitentiary, informed of his unfailing obedience to all rules and regulations appertaining to inmates there, and made privy to the defendant's confident expressions that rehabilitation already has set in,

---

5. At sentence defendant said: "I have a responsibility and a very strong love for my mother, sister and my childhood sweetheart. . . .

[I]f you didn't know me my looks might scare you . . . . I'm an easy-going good-natured guy." Transcript of March 14, 1978 at 26.

counsel advances the contention that "exemplary adjustment in prison which sets a positive model for other prisoners is as praiseworthy and meaningful as assistance to law enforcement officials in the investigation of crimes." Movant's Memorandum at 16. Then, to our mind, counsel engages in hyperbole of the first order: "This is particularly true where, as here, celerious rehabilitation appeared to be in the realm of the miraculous." *Id.*

We have had frequent occasion to reduce (sometimes substantially) sentences we imposed, including "heavy sentences." Where the applicant (even a hardened offender) cooperated willingly and fully with the prosecuting authority and we were completely satisfied on that score, we have reduced the sentence. *See United States v. Garcia*, 544 F.2d 681, 682 (3rd Cir. 1976) ("[A] court may properly invoke its power to grant lenity to those who, having admitted transgressions against the sovereign, thereafter assist the sovereign in improving social order and the public welfare."); *United States v. Unterman*, 433 F.Supp. 647, 648 (S.D.N.Y.1977) ("Our determination to grant defendant's application and reduce his sentence is based upon [the fact that] we believe that defendant has made a genuine effort to cooperate with the Government . . . . [W]e believe credit should be given for the sincerity of defendant's attempts at cooperation.") In each instance we were convinced that without the applicant's extensive help, extremely active racketeers would continue their nefarious practices without let-up. Very often, indeed, the information, the "leads," the secrets so revealed have brought serious offenders to account, with the usual result that convictions followed upon the thorough preparation of the facts and the law professionally presented by the determined prosecutor.

Thus, the commonwealth is the ultimate beneficiary of the prisoner whose efforts may well be regarded as truly praiseworthy and meaningful in his assistance to law enforcement officials in the investigation of crimes. We must add that, much to our surprise, we frequently learn (on such applications to reduce sentence) that the offender "came forward" and without promise of reward made his disclosures which proved of significant benefit to the community, and did so fully aware at all times that his life and limb were in danger.

This experience and such others as we have had occasion to mention in the course of this opinion, enable us to discern the latent as well as the patent merits of the application before us. "The life of the law has not been logic," wrote Mr. Justice Oliver Wendell Holmes, "it has been experience." There also is great wisdom indeed in our Circuit Court's pronouncement in 1943:

> Much harm is done by the myth that, merely by putting on a black robe and taking the oath of office as a judge, a man ceases to be human and strips himself of all predilections, becomes a passionless thinking machine. . . . We are born with predispositions . . . Only death yields complete dispassionateness, for such dispassionateness signifies utter indifference. . . . Impartiality is not gullibility. Disinterestedness does not mean child-like innocence.

*In re Linahan, Inc.*, 138 F.2d 650, 651–54 (2d Cir. 1943).

*Maximum sentence on income tax counts*

Considerable attention is devoted by counsel to the maximum sentences we imposed on three of the five income tax counts (to run consecutively with each other and with the sentences on counts one and two). Despite his interpretation "it is understood that the Court's objectives in sentencing movant extended beyond vindication of the interests protected by the tax laws. The Court sentenced an offender who it felt was in need of punishment for a life time of ill deeds," we are urged: "At the very least the tax count sentences should be ordered to run concurrently with each other. . . . The sentences imposed on the false tax exemption counts are substantially in excess of the norm for such offenses." Movant's Memorandum at 19,

20. In support thereof, a series of cases is set forth.[6]

The cases cited involved defendants regularly employed in professional pursuits or business; none appear to have had a prior criminal record. In sharp contrast, except for a relatively short period, this defendant had no lawful employment whatever. Instead he had acquired an extensive serious criminal record before we imposed sentence. Further, the evidence at trial revealed the ease with which he brazenly resorted to false swearing when he executed and filed his income tax returns—characteristic of "an individual whose whole life from the age of 16 to his then age of 48 had shown a contemptuous disregard for [the] law." *United States v. Ochs*, 595 F.2d 1247, 1262 (2d Cir. 1979).

Aside from all else, we must point out that the total period of confinement meted out in any case is of primary concern. For our purpose in the instant case "we are not concerned with how the sentence was structured." *United States v. Ochs*, 595 F.2d at 1262.

### Cases defendant regards helpful

Counsel calls our attention to the meritorious and salutary impact which can result from the reduction of sentence process, pointing out instances in which judicial approval was recorded.[7] We certainly subscribe to the general pronouncements there to be found. However, they do not furnish an answer to the problem which confronts us here, for the facts and circumstances, as should be expected, differ from case to case. Not a single case cited (where sentence was reduced), for instance, dealt with either a determined offender or one who applied for early release on the slim evidence presented to us. In *U. S. v. Erb*, for example (cited in footnote 7, *supra*), the Court regarded the applicant "not a persistent or habitual offender."

### Conclusion

■ We do not despair of the defendant's chances ultimately to achieve moral values that will enable him to climb to higher ground. In the main, that is up to him. We do not say that his industry and pleasantness while in present confinement have been solely to earn "credits" which will support his application for parole and entitle him to other benefits; such conduct may be coupled with a strong desire to "go straight." We simply do not know—so thin is the evidence before us. In view of what is known of the whole man before and since our sentence was imposed, satisfactory

---

6. *United States v. Stout*, 601 F.2d 325 (7th Cir. 1979); *United States v. Wilhelm*, 570 F.2d 461 (3rd Cir. 1978); *United States v. Slutsky*, 487 F.2d 832 (2d Cir. 1973), *cert. den.*, 416 U.S. 937, 94 S.Ct. 1937, 40 L.Ed.2d 287 (1974); *United States v. Cramer*, 447 F.2d 210 (2d Cir. 1971); *United States v. Lodwick*, 410 F.2d 1202 (8th Cir. 1969), *cert. den.*, 396 U.S. 841, 90 S.Ct. 105, 24 L.Ed.2d 92 (1970); *Harris v. United States*, 402 F.2d 464 (10th Cir. 1968); *Genet v. United States*, 375 F.2d 960 (10th Cir. 1967); *Heidrich v. United States*, 373 F.2d 540 (5th Cir.), *cert. den.*, 387 U.S. 943, 87 S.Ct. 2076, 18 L.Ed.2d 1330 (1966); *United States v. Moody*, 371 F.2d 688 (6th Cir. 1967); *United States v. Goldman*, 352 F.2d 263 (3rd Cir. 1965); *Pinedo v. United States*, 347 F.2d 142 (9th Cir.), *cert. den.*, 382 U.S. 976, 86 S.Ct. 547, 15 L.Ed.2d 468 (1965).

7. Counsel cites the following cases as being dispositive: *United States v. Grayson*, 438 U.S. 41, 98 S.Ct. 2610, 57 L.Ed.2d 582 (1978); *Bordenkircher v. Hayes*, 434 U.S. 357, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978); *United States v. Garcia*, 544 F.2d 681 (3rd Cir. 1976); *United States v. Sand*, 541 F.2d 1370 (9th Cir. 1976), *cert. denied*, 429 U.S. 1103, 97 S.Ct. 1130, 51 L.Ed.2d 553 (1977); *United States v. Prince*, 533 F.2d 205 (5th Cir. 1976); *United States v. Donner*, 528 F.2d 276 (7th Cir. 1976); *United States v. Barber*, 456 F.2d 579 (3rd Cir. 1972); *United States v. Jones*, 444 F.2d 89 (2d Cir. 1971); *United States v. Kee Ming Hsu*, 424 F.2d 1286 (2d Cir. 1970); *United States v. Birnbaum*, 402 F.2d 24 (2d Cir. 1968), *cert. denied*, 394 U.S. 922, 89 S.Ct. 1181, 22 L.Ed.2d 455 (1969); *United States v. Ellenbogen*, 390 F.2d 537 (2d Cir. 1968); *McCartney v. United States*, 382 F.2d 116 (9th Cir. 1967); *United States v. Magnano*, 443 F.Supp. 876 (S.D.N.Y.1978); *United States v. Unterman*, 433 F.Supp. 647 (S.D.N.Y. 1977); *United States v. McIlwain*, 427 F.Supp. 358 (D.C.D.C.1977); *United States v. Erb*, 425 F.Supp. 1349 (S.D.N.Y.1977); *United States v. Liddy*, 397 F.Supp. 947 (D.C.D.C.1975), *aff'd*, 530 F.2d 1094 (D.C.Cir. 1976), *cert. denied*, 426 U.S. 937, 96 S.Ct. 2652, 49 L.Ed.2d 388 (1977); *United States v. Stromberg*, 179 F.Supp. 278 (S.D.N.Y.1959).

evidence of true rehabilitation and contrition, involving solidly embedded moral values that assure his own good moral living without danger to the community, are best left to the behaviorist, the psychiatrists and scholars in allied fields, whose impressive testimony might well turn the tide in defendant's favor.

As we see it, we have no alternative: we are constrained to and do deny the application in all respects.

SO ORDERED.